**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CESAR MELGOZA PEREZ,<br><br>          Petitioner,<br><br>     v.<br><br><br>MARTIN BITER, Warden, et al.,<br><br>          Respondents. | Case No. 1:11-cv-01766-LJO-SKO-HC<br><br>FINDINGS AND RECOMMENDATIONS TO DIMISS IN PART AND DENY IN PART THE SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS (DOC. 22) AND DENY PETITIONER'S MOTIONS TO EXPAND THE RECORD AND FOR AN EVIDENTIARY HEARING (DOC. 37)<br><br>FINDINGS AND RECOMMENDATIONS TO ENTER JUDGMENT FOR RESPONDENT AND TO DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY<br><br>**OBJECTIONS DEADLINE:**<br>**THIRTY (30) DAYS** |

      Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 through 304. Pending before the Court is the second amended petition (SAP), which was filed on June 20, 2012, and associated motions concerning expansion of the record and an evidentiary hearing filed by Petitioner on December 10, 2012.  Respondent filed an answer to the petition on September 20, 2012, and opposition to Petitioner's

1

1   motions on December 31, 2012.  Petitioner filed a traverse to the

2   answer on December 14, 2012, but did not file a reply to the

3   opposition to the motions.  On February 14, 2013, the Court deferred

4   consideration of the motions until the Court considered the merits

5   of the petition.

6       I.  <u>Jurisdiction</u>

7       Because the petition was filed after April 24, 1996, the

8   effective date of the Antiterrorism and Effective Death Penalty Act

9   of 1996 (AEDPA), the AEDPA applies in this proceeding.  <u>Lindh v.</u>

10  <u>Murphy</u>, 521 U.S. 320, 327 (1997); <u>Furman v. Wood</u>, 190 F.3d 1002,

11  1004 (9th Cir. 1999).

12      The challenged judgment was rendered by the Stanislaus County

13  Superior Court (SCSC), which is located within the territorial

14  jurisdiction of this Court.  28 U.S.C. §§ 84(b), 2254(a), 2241(a),

15  (d).  Petitioner claims that in the course of the proceedings

16  resulting in his conviction, he suffered violations of his

17  constitutional rights.  Accordingly, the Court has subject matter

18  jurisdiction over this action pursuant to 28 U.S.C. §§ 2254(a) and

19  2241(c)(3), which authorize a district court to entertain a petition

20  for a writ of habeas corpus by a person in custody pursuant to the

21  judgment of a state court only on the ground that the custody is in

22  violation of the Constitution, laws, or treaties of the United

23  States.  <u>Williams v. Taylor</u>, 529 U.S. 362, 375 n.7 (2000); <u>Wilson v.</u>

24  <u>Corcoran</u>, 562 U.S. B, –, 131 S.Ct. 13, 16 (2010) (per curiam).

25      An answer was filed on behalf of Respondent Martin Biter, who,

26  pursuant to the judgment, has custody of Petitioner at his

27  institution of confinement.  (Doc. 28, 12.)  Petitioner has named as

28  a respondent a person who has custody of Petitioner within the

2

meaning of 28 U.S.C. § 2242 and Rule 2(a) of the Rules Governing Section 2254 Cases in the District Courts (Habeas Rules).  <u>See</u>, <u>Stanley v. California Supreme Court</u>, 21 F.3d 359, 360 (9th Cir. 1994).  Accordingly, the Court has jurisdiction over the person of the Respondent.

II.  <u>Procedural Summary</u>

The evidence introduced at trial showed that on July 10, 2004, Petitioner fatally shot Ruben Sanchez Neuman.  Petitioner was a member of the South Side Treces (SST), which is a set of the Surenos street gang.  Neuman was a member of the Nortenos street gang. Petitioner fled to Mexico, but a few years later he was apprehended and returned to the United States.

On March 11, 2009, a jury in the SCSC found Petitioner guilty of the first-degree murder of Neuman in violation of Cal. Pen. Code § 187(a), and assault of Neuman by means of force likely to produce great bodily injury in violation of Cal. Pen. Code § 245(a)(1).  The jury further found that the murder was premeditated and deliberate; Petitioner committed the murder and assault for the benefit of a criminal street gang within the meaning of Cal. Pen. Code § 186.22(b)(1)); in the course of the murder, Petitioner personally discharged a firearm and proximately caused Neuman's death within the meaning of Cal. Pen. Code § 12022.53(d) and (e)(1); and Petitioner was armed with a firearm during the assault within the meaning of Cal. Pen. Code § 12022(a).  (2 CT 548-51.)

On May 22, 2009, Petitioner was sentenced to fifty years to life in prison for the murder, plus a determinate term of eight years to be served first for the assault. (3 CT 608-13.)

On direct appeal, the Court of Appeal of the State of

California, Fifth Appellate District (CCA) affirmed the judgment but modified it to stay Petitioner's sentence for the assault, thus reducing his overall sentence to fifty years to life.  (LD 8 at 33-37, 39; LD 9 [Order Modifying Opinion [No Change in Judgment]].)

Petitioner filed a petition for review in the California Supreme Court (CSC), and on April 13, 2011, the CSC denied review as follows:

> The petition for review is denied without prejudice to any relief which defendant might be entitled after this court decides *People v. Dungo*, S176886, *People v. Gutierrez*, S176620, *People v. Lopez,* S177046, and/or *People v. Rutterschmidt*, S176213.

(LD 11, LD 10.)

On October 24, 2011, Petitioner filed his original petition in this case and a motion for a stay and for abeyance of the proceedings.  (Doc. 1, doc. 2.)  On November 14, 2011, the Magistrate Judge recommended that Petitioner's state law claims be dismissed without leave to amend.  (Doc. 10.)

On the same day, Petitioner filed a habeas corpus petition in the CSC.  (LD 12.)

On December 12, 2011, the District Judge adopted the Magistrate Judge's findings and recommendations, dismissed the state law claims without leave to amend, and referred the matter back to the Magistrate Judge, who denied Petitioner's motion for stay and abeyance on January 4, 2012.  (Doc. 14.)  Petitioner was given leave to withdraw unexhausted claims and seek a Kelly stay.  (Id.)  On January 13, 2012, Petitioner filed a first amended petition and moved to withdraw his unexhausted claims and hold the petition in abeyance pursuant to a Kelly stay.  (Doc. 16, doc. 17.)  On March 29, 2012, the Magistrate Judge granted the motion for a stay and

abeyance.  (Doc. 18.)

On April 11, 2012, the CSC denied Petitioner's habeas petition without a statement of reasoning or citation of any authority.  (LD 13.)

On May 2, 2012, Petitioner lodged in this proceeding his SAP. (Doc. 20.)  On June 20, 2012 the court dissolved the stay and ordered that the SAP be filed.  (Doc. 21, doc. 22.)

III.  <u>Factual Summary</u>

In a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.  28 U.S.C. § 2254(e)(1); <u>Sanders v. Lamarque</u>, 357 F.3d 943, 947-48 (9th Cir. 2004).  This presumption applies to a statement of facts drawn from a state appellate court's decision.  <u>Moses v. Payne</u>, 555 F.3d 742, 746 n.1 (9th Cir. 2009).  The following statement of facts is taken from the opinion of the CCA in <u>People v. Cesar Melgoza Perez</u>, case number F058027, filed on January 6, 2011 (LD 8):

FACTS

**I. Neuman's Murder on July 10, 2004.**

On the evening of July 10, 2004, a party was held in Modesto. The attendees included appellant, Luis Avina Meza, Sergio Felix, Raul Pena, Jose Ochoa, Alvaro Arellano, Rogelio Garcia and Francisco Gomez.FN2 All of them except Meza were active Surenos gang members; Meza associated with Surenos gang members.

> FN2. Meza, Felix, Pena and Ochoa entered into plea bargains which obligated them to testify truthfully in this case.

Appellant brought a gun to the party. He had short hair and wore a black shirt.

Appellant argued with a man at the party. The owner of the house asked appellant to leave.

Ochoa remained at the party, but the rest of the group decided to go to another party in the City of Newman. They left in a pickup truck and a Jeep. Gomez drove the truck, with Meza as a passenger. Pena drove the Jeep; appellant, Felix, Arellano, and Garcia were passengers. Pena's girlfriend, Teresa Marlen Vizcarra, accompanied the group. She rode in the Jeep.

On the way, both vehicles stopped. Pena, Gomez and appellant walked into an orchard. Pena saw appellant put something into the top of his pants. Pena asked appellant if he had a gun. Appellant replied affirmatively. Since Pena was on probation, he told appellant to ride in the truck. Appellant rode in the truck the rest of the way to Newman.

When the group reached Newman, both vehicles stopped at a liquor store. Pena went inside to buy some beer. When Pena exited the liquor store, Gomez told him that "a northerner guy went by" and "they said verbally words to each other."

Around 10:00 p.m., the group left the liquor store. Meza was driving the truck with Gomez and appellant as passengers. The rest of the group was in the Jeep, which was driven by Pena. The Jeep followed the truck.

About two blocks away from the liquor store, Neuman was walking with his bicycle through an intersection. Neuman wore red pants.FN3 He was carrying a paper bag containing some beer.

> FN3. Nortenos are associated with the color red and wear red clothing. Surenos are associated with the color blue and wear blue clothing.

Appellant told Meza to stop the truck. Meza stopped the truck in the middle of the street.
Appellant got out of the truck, ran up to Neuman and verbally confronted him. They argued and then exchanged punches.

6

Meza and Gomez got out of the truck and moved towards appellant and Neuman.

Pena stopped his Jeep in the middle of the intersection. Pena backed up the Jeep, accidentally hitting appellant and Neuman. The back window of the Jeep shattered. Appellant and Neuman fell to the ground. They both got up. Appellant angrily yelled at Pena.

Felix, Garcia and Arellano got out of the Jeep. Pena and his girlfriend stayed in the Jeep.

Neuman had beer in the brown paper bag. He threw a beer at Gomez, but it did not hit him.

Appellant asked Gomez if "he was going to get away with that." Gomez said that "he needs some backup." Meza walked towards Gomez.

Appellant punched Neuman in the chest and Neuman fell to the ground. Meza, Gomez, Felix, Arellano, Garcia and appellant stood in a semi-circle around Neuman, punching and kicking him.

A woman came out of a nearby house and screamed. Meza testified, "So that's when everybody started running back to the cars." Meza also said, "So the only one who stayed was [appellant]." Meza testified that he turned around and saw appellant pull out a gun from the waistband of his pants. He pointed the gun down at Neuman, who was lying on the ground. Meza testified appellant fired four or five shots at Neuman.

Felix testified that the group was still punching and kicking Neuman when appellant suddenly had a gun in his hand. Appellant started firing the gun at Neuman. Felix thought that appellant fired more than four or five shots. Felix testified that when appellant started shooting, he, Arellano and Garcia ran back to the Jeep. When Felix got into the Jeep, shots were still being fired.

Pena testified that he saw Arellano, Felix and Garcia getting back into the Jeep. At the same time, Pena saw five or six gun flashes. Then he saw appellant pointing a gun at the ground.

7

Meza got into the driver's seat of the truck, and Gomez
got into the passenger's seat. Meza began to drive away.
Appellant ran after the truck. He yelled for them to stop
and wait for him. Meza stopped the truck. Appellant jumped
into the back of the truck's bed. The truck sped away. The
rest of the group, including Arellano, left in the Jeep.

A person approached Neuman and comforted him.

A police officer arrived about 10:40 p.m. The officer saw
what appeared to be bullet wounds on Neuman's torso.
Neuman died before he could be transported to the
hospital.

Numerous bystanders and neighbors heard or saw some or all
of the events culminating in Neuman's murder.FN4 A police
officer testified that someone told him that he/she
witnessed Neuman's murder. This person told the police
officer that during the fight, one person started shooting
down at the ground. This person heard four shots. This
person described the shooter as a male who was about five
feet 10 inches tall and weighed approximately 130 to 140
pounds. This person said the shooter wore a black shirt
and had short hair. This person thought the shooter got
into a Jeep. The Jeep drove away. Then this person saw two
people run behind a pickup truck. The truck slowed and the
two people got into the bed of the truck and the truck
drove away.

> FN4. Appellant has not challenged the
> sufficiency of the evidence and we have not
> discerned any error requiring us to assess the
> strength of the evidence supporting the guilty
> verdicts. Therefore, it is not necessary to set
> forth everyone's statements to police officers
> and/or trial testimony. Since the murder and
> assault were gang-related, these people will not
> be named unless this information is necessary to
> resolve an appellate issue.

A bystander testified that he/she was inside his/her
house. He/she heard a crash and then heard three or four
gunshots. He/she went out to the front porch. He/she saw a
man chasing after a pickup truck. The truck slowed and the
man climbed into the truck's bed. The man appeared to be
"fairly young" and his height and weight was characterized
as "medium." In response to a question whether the man was

8

bald, this person responded, "Yes. I didn't see any hair. It was like a silhouette. I didn't see any hair."

Meza drove the truck to his house. During the drive, appellant opened the window separating the truck's cabin from the bed. Appellant said that he had killed the man. Meza and Gomez were upset. They asked appellant why he killed the man. Appellant said the man had a gun. Meza and Gomez disagreed, telling appellant that the man did not have a gun. Then appellant "said he's one man less for them."

On the morning after the shooting, Pena told Ochoa that the back window of the Jeep was broken because "they jumped some guy" when they got to Newman. Pena said that he and his girlfriend stayed in the Jeep, and "[p]retty much everybody [else] jumped the guy." Pena told Ocha that he was backing up the Jeep to get everyone back in the vehicle. The rear of the Jeep accidentally hit appellant "and that guy they were jumping." Then Arellano "got in it and started kicking the guy. That's when [appellant] pulled out a gun and shot the guy."

**II. Drive-by Shooting on July 12, 2004.**

On the night of July 11, 2004, Jose Cruz was murdered during a drive-by shooting, which was possibly committed by Nortenos.

On the evening of July 12, 2004, two Honda Accords were reported stolen. It was stipulated that Pena stole one of the Hondas.

About 10:00 p.m., two Hondas matching the description of the stolen vehicles were used in a retaliatory drive-by shooting targeting Nortenos. Several prosecution witnesses were involved in this drive-by shooting.FN5

> FN5. Appellant was not charged in this case with any crime arising from the vehicular thefts or the July 12 drive-by shooting.

After this drive-by shooting, police officers searched a residence.  Ochoa, Arellano and some other people were hiding in the garage. Pena was arrested nearby.

9

Three guns had been secreted under the steps of the residence's back porch. One of the guns was a black semi-automatic .380-caliber Beretta handgun. The Beretta was loaded with an empty magazine; another empty magazine was found lying next to the Beretta. On the east side of the house, police officers found some ammunition, including some .380-caliber rounds.

Gunshot residue tests were performed on Pena, Gomez, Ochoa and Manuel Mendez after they were arrested in connection with the July 12, 2004, drive-by shooting. Gunshot residue particles were detected on Arellano's, Gomez's and Ochoa's hands. No particles were detected on Pena's hands.

**III. Police Interviews.**

During a police interview, Vizcarra "said that when they were all around the victim, kicking him and stomping him, she saw [appellant] remove a gun and point the gun down." She turned her head away and heard three or more gunshots.

During police interviews, Pena and Felix identified appellant as the shooter. They both said appellant got into the pickup truck.

A sheriff's deputy interviewed Arellano. Arellano told him that he wore a black shirt on the night Neuman was killed. Arellano said that when they got to Newman, appellant and Gomez argued with a man on a bicycle because the man threw something towards the truck. The man was a Norteno. Arellano said he and Felix got out of the Jeep. Arellano admitted that he was part of the group that kicked Neuman. Arellano said "he was already getting back to the Jeep and inside the Jeep when he heard those shots." Arellano said he looked back and saw muzzle flashes. Gomez and appellant were standing by Neuman at that time. Arellano denied knowing who shot Neuman. Arellano said that he was not the shooter.

During a police interview, Ochoa related a conversation he had with Pena after Neuman's death. Pena told Ochoa that he and all his friends were Surenos. "They just saw a Norteno riding a bike," so everyone except Pena and his girlfriend "went over there and started jumping him. And while they were jumping him, [appellant] pulled out a gun and just shot him." Ochoa said he asked Pena why appellant

10

shot the guy and Pena replied, "because, you know, he was wearing red."

In a police interview, Meza admitted participating in the attack on Neuman. Meza said that they had kicked and punched Neuman for over a minute when a woman yelled at them to "knock it off." At that point, they started returning to their vehicles. Meza said he was walking towards the truck with Gomez when appellant pulled out a handgun, pointed it in a downward motion and started firing. At that point, they all started running to the vehicles. Meza heard five or six shots. Meza said the attack on Neuman was unprovoked and occurred solely because of Neuman's Norteno gang affiliation.

**IV. Appellant's Flight to Mexico.**

On July 13, 2004, appellant went to the probation department for an unscheduled visit. He saw his probation officer and requested permission to accompany his mother to visit an aunt in Arizona. The probation officer granted appellant permission to go to Arizona until August 6, 2004. Appellant never contacted his probation officer again.

On July 14, 2004, police officers unsuccessfully attempted to locate appellant at his mother's house in Modesto and at his father's house in Salinas.

A bench warrant was issued on July 15, 2004.

On July 20, 2004, appellant's mother told appellant's probation officer that she did not know where appellant was.

In 2006, appellant was located in Mexico. He was living under a different name. He was arrested by federal agents. Several months later, he was returned to California in custody.

**V. Physical Evidence and Autopsy Results.**

A bicycle, a brown paper bag containing broken glass from a beer bottle, vehicle window glass, pieces of a beer bottle and some beer cans were found on the ground around the intersection where Neuman died.

11

Blood stains were found on the sidewalk. Four bullet
impact marks were found to the left of the blood stain.
Some .380-caliber cartridge casings and bullet slugs were
found in the area of the crime scene. It was subsequently
determined that the locations of the casings and bullet
impact marks indicated the shooter stood upright and fired
the gun downward.

Neuman's shirt had seven bullet holes that "were all close
to each other almost like in a half circle as well." There
was a shoe imprint on the back of the shirt. A fragment of
a bullet was found in Neuman's shirt.

A fully jacketed medium-caliber bullet was retrieved from
Neuman's body. It was determined that this bullet was
fired by the Baretta.

It was stipulated that the Baretta was used in Neuman's
killing and used to return fire at the car committing the
drive-by shooting that killed Jose Cruz.

It was also stipulated that a usable latent fingerprint
was developed from the Baretta. Appellant was not the
source of this fingerprint.

An autopsy was performed. Neuman's cause of death was
shock and hemorrhage due to multiple gunshot wounds.
Neuman suffered seven gunshot wounds. Five bullets entered
the right side of Newman's back. These five gunshots were
grouped together in a diameter of 12 to 15 inches. Both
lungs, the liver, stomach, right adrenal gland, spinal
column, diaphragm and aorta were perforated. Other bullets
caused a grazing wound to Neuman's abdomen and entered his
upper right arm. Neuman also suffered blunt force injuries
that were consistent with a fight.

The gunshot wounds to Neuman's back and arm were similar
looking and had a similar direction on the body,
indicating the shots occurred in rapid succession. The
shooter was standing on the right side of Neuman, and
Neuman had his back or right side to the shooter when at
least six of the shots were fired. The angles of the
wounds were consistent with the shooter being above the
victim or the victim being angled towards the shooter and
the victim falling toward the shooter after being struck
by the first three bullets. All of the shots were fired
from a distance exceeding 18 inches.

12

**VI. Gang Testimony.**

Froilan Mariscal gave expert gang testimony. After
explaining the origins of the Surenos and [Nortenos]
gangs, he identified the SST as a set of the Surenos gang.
Mariscal opined that the Nortenos and Surenos are criminal
street gangs. He testified about predicate offenses.
Mariscal opined that appellant was an active Surenos gang
member on the date of Neuman's murder. Mariscal also
opined that the assault and murder of Neuman were
committed to benefit a criminal street gang.

**VII. Appellant's Defense Theory: Arellano Shot Neuman.**

The defense called Daniel Britt. Britt testified that he
met Felix while they were housed in the gang drop-out unit
at Corcoran State Prison. Britt testified that Felix told
him Arellano shot Neuman. Felix also said "that they had
busted some 15-year-old youngster. He was in Mexico. But
the Surenos said he was supposed to take the rap because
he was the youngest one and would get less time." Britt
admitted that defense counsel and the defense investigator
were the first people he told about these statements.

Britt also testified that in 2006, a Sureno gang member
fatally shot Michael Arreola, who was a Norteno gang
member. Britt identified a photograph of Arellano as the
shooter. However, Britt later shared a jail cell with
Arellano and was no longer certain that Arellano shot
Arreola.

Felix testified that Britt approached him in the prison
yard and harassed him with questions about Neuman's
murder. Felix said he falsely told Britt that Arellano
shot Neuman so Britt would stop bothering him.

(LD 8, 2-11.)

IV.   Introduction of Accomplice Testimony

Petitioner argues he suffered a violation of his Fifth and

Fourteenth Amendment rights to due process of law and a

fundamentally fair trial by the introduction of the testimony of the

13

four accomplices because the testimony was coerced by the accomplices' plea agreements, which required truthful testimony and represented that the accomplices' prior statements to law enforcement agents were true.

A.   Standard of Decision and Scope of Review

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the

judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Clearly established federal law refers to the holdings, as opposed to the dicta, of the decisions of the Supreme Court as of the time of the relevant state court decision.  Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court's decision contravenes clearly established Supreme Court precedent if it reaches a legal conclusion opposite to, or substantially different from, the Supreme Court's or

concludes differently on a materially indistinguishable set of facts.  Williams v. Taylor, 529 U.S. at 405-06.  The state court need not have cited Supreme Court precedent or have been aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [it]."  Early v. Packer, 537 U.S. 3, 8 (2002).  A state court unreasonably applies clearly established federal law if it either 1) correctly identifies the governing rule but applies it to a new set of facts in an objectively unreasonable manner, or 2) extends or fails to extend a clearly established legal principle to a new context in an objectively unreasonable manner.  Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002); see, Williams, 529 U.S. at 407.  An application of clearly established federal law is unreasonable only if it is objectively unreasonable; an incorrect or inaccurate application is not necessarily unreasonable.  Williams, 529 U.S. at 410.  A state court's determination that a claim lacks merit precludes federal habeas relief as long as it is possible that fairminded jurists could disagree on the correctness of the state court's decision.  Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786 (2011).  Even a strong case for relief does not render the state court's conclusions unreasonable.  Id.  To obtain federal habeas relief, a state prisoner must show that the state court's ruling on a claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility

15

for fairminded disagreement." Id. at 786-87.  The standards set by § 2254(d) are "highly deferential standard[s] for evaluating state-court rulings" which require that state court decisions be given the benefit of the doubt, and the Petitioner bear the burden of proof. Cullen v. Pinholster, 131 S.Ct. at 1398.  Habeas relief is not appropriate unless each ground supporting the state court decision is examined and found to be unreasonable under the AEDPA.  Wetzel v. Lambert, --U.S.--, 132 S.Ct. 1195, 1199 (2012).

In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S.Ct. at 1398.  Evidence introduced in federal court has no bearing on review pursuant to § 2254(d)(1).  Id. at 1400. Further, 28 U.S.C. § 2254(e)(1) provides that in a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.  A state court decision on the merits based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state proceedings.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

With respect to each claim, the last reasoned decision must be identified in order to analyze the state court decision pursuant to 28 U.S.C. § 2254(d)(1).  Barker v. Fleming, 423 F.3d 1085, 1092 n.3 (9th Cir. 2005); Bailey v. Rae, 339 F.3d 1107, 1112-13 (9th Cir. 2003).

### B.   The State Court Decision

The CCA's decision on the merits of the coercion claim was followed by the CSC's summary denial of a petition for review. Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This Court will thus "look through" the unexplained decision of the CSC to the CCA's last reasoned decision as the relevant state court determination.  Id. at 803-04; Taylor v. Maddox, 366 F.3d 992, 998 n.5 (9th Cir. 2004).

The CCA addressed the issue of coerced testimony by first reviewing the pertinent facts as follows:

**A. The Court Did Not Err by Admitting the Accomplices'
    Testimony.**

The district attorney entered into written plea agreements
with Pena, Felix, Meza and Ochoa and they testified as
prosecution witnesses. Appellant contends the plea
agreements were coercive and the trial court erred by
refusing to exclude these witnesses. As will be explained,
the plea agreements were not coercive. Admission of the
contested testimony was proper and did not infringe
appellant's constitutional rights to a fair trial and due
process of law.

17

**1. Facts.**

All four plea agreements provided, "It is my understanding that you wish to testify regarding the following: your personal knowledge and observations regarding the events and persons responsible for these crimes, and all other matters about which you know regarding these crimes."

Then the plea agreements of Felix and Meza stated, "You have given a statement to [specified detective or investigator] on [specified date], which [you] have represented to be truthful." Pena's plea agreement stated, "You have given a statement to [specified police officers], which [you] have represented to be truthful." This section of Ochoa's plea agreement was worded slightly differently. It provided, "You have given a statement to [specified police officers], in which you answered questions and provided information about the murder and the drive-by shooting, and have represented to be truthful."

Next, all four of the plea agreements essentially provided the witness agreed to testify truthfully to any and all hearings, trials and retrials on these matters.

Then all four plea agreements provided that if all of the following obligations were fulfilled, the person would receive a specified benefit from the district attorney. These obligations included the following: (1) testify truthfully at all hearings, trial, or retrials; (2) attend all necessary court appearances; and (3) stay available to law enforcement.

Next, each plea agreement set forth the benefit provided by the district attorney. The benefit differed for each individual.

Then each plea agreement stated it would be null and void if the enumerated conditions were not fulfilled or if it was discovered that the witness testified falsely. Further, the witness would be subject to prosecution for perjury.

At trial, defense counsel argued the plea agreements were coercive because they violated the *Medina* rule by essentially requiring Pena, Felix, Meza and Ochoa to testify consistently with their prior statements. (*People*

18

*v. Medina* (1974) 41 Cal.App.3d 438, 116 Cal.Rptr. 133
(*Medina*).) The court overruled this objection.

### 2. The Medina rule.

A plea agreement requiring only that the witness testify
fully and truthfully is valid. But a plea agreement that
expressly requires the witness to conform to an
established script or one that is conditioned on a
particular result is unfairly coercive. Admission of
testimony that is the product of a coercive plea agreement
infringes the defendant's federal constitutional fair
trial right. (*People v. Jenkins* (2000) 22 Cal.4th 900,
1010, 95 Cal.Rptr.2d 377, 997 P.2d 1044 (*Jenkins*); *Medina,*
*supra*, 41 Cal.App.3d at pp. 449-456, 116 Cal.Rptr. 133;
*People v. Green* (1951) 102 Cal.App.2d 831, 838-839, 228
P.2d 867.) This principle is known as the *Medina* rule.
(See, e.g., *People v. Fields* (1983) 35 Cal.3d 329, 360,
197 Cal.Rptr. 803, 673 P.2d 680 (*Fields*).)

In *Medina*, three witnesses testified under a grant of
immunity subject to the condition that the witness did not
materially or substantially change her testimony from the
tape-recorded statement she gave to law enforcement
officers. The appellate court acknowledged that a grant of
immunity could be conditioned on a requirement that the
witness testify fully and fairly to the facts, but held
that when the terms of the immunity place the witness
under a strong compulsion to testify in a particular
fashion, the testimony is tainted and inadmissible.
(*Medina, supra*, 41 Cal.App.3d at p. 456, 116 Cal.Rptr.
133.)

In several cases, our Supreme Court has assessed plea
agreements and determined that they were not coercive. In
the process, it has impliedly determined that the *Medina*
rule be restrictively interpreted. (See, e.g., *People v.*
*Reyes* (2008) 165 Cal.App.4th 426, 434, 80 Cal.Rptr.3d 619
(*Reyes*).)

(LD 8, 11-13.)

The state court then reviewed the state cases in which the CSC
had held that plea agreements in various sets of circumstances were
not coercive, including 1) where a witness agreed to testify
according to a statement she had given at a specified time, which

19

she confirmed was truthful, where the witness understood that if she told a different story the agreement would fall through; 2) where a plea agreement was not offered until after a witness gave a statement to police and was not told or led to believe he would receive the benefit of the plea bargain only if his testimony conformed with his prior statement to police; 3) where unwritten portions of a plea bargain, extraneous to a written plea agreement, provided that the witness had already passed a polygraph examination indicating the witness was being truthful, the witness agreed to testify truthfully, and the witness agreed he had already truthfully told the facts to investigators.  The CCA noted that in these cases the CSC had acknowledged that although the witnesses may have felt some compulsion to testify consistently with their earlier statements, the plea agreements obligated them only to testify truthfully and did not obligate them to testify consistently with prior statements regardless of the truth of those statements.  (LD 8, 13-16.)  The decision of the CCA continued as follows:

> This line of authority was cogently examined by the Second District Court of Appeal in *Reyes, supra*, 165 Cal.App.4th 426, 80 Cal.Rptr.3d 619. Reyes recognized, " 'The California Supreme Court has refused to extend *Medina* beyond the instance in which a plea agreement expressly requires consistency between accomplice testimony and a prior statement.'" (*Id.* at p. 434, 80 Cal.Rptr.3d 619.) Thus, "[a] coordinate principle of the Supreme Court's Medina jurisprudence is the understanding, ... that although plea agreements calling for testimony naturally will exert some compulsion to testify satisfactorily, an agreement that binds the witness only to testify truthfully, and not in some prearranged fashion, cannot be deemed invalid." (*Id.* at p. 435, 80 Cal.Rptr.3d 619.)

> In *Reyes, supra,* 165 Cal.App.4th 426, 80 Cal.Rptr.3d 619, the appellate court applied this line of authority and upheld a plea agreement which contained a provision that

if it was discovered the witness had "'already not told us
the truth about a material significant matter'" in a prior
police interview, the witness would be in breach of the
plea agreement. (*Id.* at p. 433, 80 Cal.Rptr.3d 619.) It
reasoned that "by its terms the interview provision did
not qualify or restrict [the witness's] agreement to
testify truthfully, nor did it direct that he testify in
conformity with his interview. Under our Supreme Court's
decisions on claims of '*Medina* error,' these are critical,
dispositive distinctions." (*Id.* at p. 434, 80 Cal.Rptr.3d
619.) *Reyes* rejected appellant's contention that this
provision effectively coerced the witness to testify in
accordance with the interview, as follows: "This claim is
hypothetical and unverifiable. Practically, it is far more
likely that [the witness] entered into the interview
provision because he, like the prosecution believed his
interview was truthful. If that is so, the provision posed
no improper compulsion. [Citation.]" (*Id.* at p. 434, 80
Cal.Rptr.3d 619.)

### 3. The plea agreements did not violate the Medina rule.

Having examined the relevant line of authority, we now
examine appellant's contention that the plea agreements in
this case were unfairly coercive because they "impliedly
specified that in each case the witness would be deprived
of the benefit of his bargain if his testimony deviated
from the extrajudicial statements he had given to police."

In assessing this claim, "we review the record and reach
an independent judgment whether the agreement under which
the witnesses testified was coercive and whether defendant
was deprived of a fair trial by the introduction of the
testimony, keeping in mind that generally we resolve
factual conflicts in favor of the judgment below.
[Citation.]" (*Jenkins, supra*, 22 Cal.4th at pp. 1010–1011,
95 Cal.Rptr.2d 377, 997 P.2d 1044.)

Appellant's argument is not convincing. Each of the plea
agreements required the witness to testify truthfully in
all proceedings. Also, they stated that each person had
given a truthful statement to a specified police officer
or investigator. Yet, there is no condition in the plea
agreements requiring the testimony to be identical to the
prior statement. Also, there is nothing in the plea
agreements indicating that the plea agreement is expressly

21

contingent on the witness sticking to a particular version or script. (*Garrison, supra*, 47 Cal.3d at p. 771, 254 Cal.Rptr. 257, 765 P.2d 419.)

The district attorney clearly expected the witnesses to testify in a manner that is materially consistent with their prior statements to the law enforcement officials specified in the plea agreements. The witnesses had represented that those prior statements were truthful. But the reference to the witness's prior police interview in the plea agreement did not restrict the contents of the witness's testimony. This is a critical distinction. Unless the plea agreement specifically requires the witness to testify in conformity to a pre-arranged script, it does not violate the *Medina* rule. Where, as here, a plea agreement only refers to a prior statement to police and contains a representation that the prior statement is the truth, the plea agreement is not unfairly coercive. (*Garrison, supra*, 47 Cal.3d at p. 771, 254 Cal.Rptr. 257, 765 P.2d 419; *Boyer, supra*, 38 Cal.4th at p. 457, 42 Cal.Rptr.3d 677, 133 P.3d 581; *Reyes, supra*, 165 Cal.App.4th at p. 436, 80 Cal.Rptr.3d 619.)

Further, examination of the testimony of the four witnesses dispels any concern that they were following a prosecution created script. They were impeached with inconsistencies between their trial testimony and pretrial statements. In his closing argument, defense counsel insisted that these witnesses should be disregarded because their stories kept changing. Also, the testimony of these four witnesses about the circumstances of Neuman's murder is generally consistent with the physical evidence recovered from the crime scene, Vizcarra's pretrial statement to the police and some of the observations by bystanders and neighbors.

For all of these reasons, we hold that the plea agreements were not coercive and appellant's constitutional rights to a fair trial and due process of law were not infringed by admission of the contested testimony.

(LD 8, 16-18.)

///

///

1
2

       C.  <u>Analysis of Application of Clearly Established</u>
          <u>Federal Law pursuant to 28 U.S.C. § 2254(d)(1)</u>

3
4
5
6
7
8
9
10
11
12

    Petitioner relies on state cases involving a requirement in plea agreements that a witness's testimony either conform to earlier statements (a so-called "consistency" clause or agreement) or result in a defendant's conviction; however, Petitioner also acknowledges that state law permits plea agreements that merely require the witness to testify fully and truthfully.  (Doc. 22, 35.)  Petitioner nevertheless argues that the agreements in the present case in effect require consistency with earlier statements and thus offend due process.

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    The Supreme Court held in <u>Pyle v. Kansas</u>, 317 U.S. 213, 214-16 (1942) that allegations that the government knowingly coerced perjured testimony from a prosecution witness stated a potential claim for habeas relief under the Due Process Clause.  <u>Id.</u>  (citing <u>Mooney v. Holohan</u>, 294 U.S. 103 (1935)).  Other cases following <u>Mooney</u> establish that due process is violated if the government knowingly uses perjured testimony or deliberately deceives the court.  <u>See</u> <u>Giglio v. United States</u>, 405 U.S. 150, 153 (1972) (prosecutor stated, and a witness testified, that there was no plea deal when there was a lenient plea agreement); <u>Miller v. Pate</u>, 386 U.S. 1, 3-7 (1967) (prosecutor knowingly presented expert testimony that misidentified paint on the defendant's clothing as blood); <u>Alcorta v. Texas</u>, 355 U.S. 28, 30-32 (1957) (per curiam) (the

prosecutor told a witness not to volunteer that the witness had a sexual relationship with the defendant's wife, and in testimony the witness denied sexual involvement with the defendant's wife).

However, there is no clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1) that prohibits plea agreements such as those in the present case, which imposed an obligation on the witness to testify truthfully after the witness had given a statement that was confirmed by the witness to be true.  Indeed, even if the plea agreement were interpreted also to require testimony consistent with the witness's earlier statement, there is no clearly established federal law providing that consistency agreements violate due process.

In Cook v. Shriro, 538 F.3d 1000 (9th Cir. 2008), cert. den. 555 U.S. 1141 (2009), the court held that the petitioner was not entitled to relief for a violation of due process where a witness testified truthfully and believed a plea agreement required him to testify consistently with an initial videotaped confession, and where the agreement provided that the witness would provide truthful responses to questions, would not knowingly make any false or misleading statements, and would be responsible for violating the agreement without any additional proof if the witness made two or more statements which were inconsistent such that at least one of them must be false.  There was no indication that any testimony given was false.  The court in Cook reviewed the status of the

pertinent law as follows:

> We agree that there is no Supreme Court case
> law establishing that consistency clauses violate due process
> or any other constitutional provision. Because it is an
> open question in the Supreme Court's jurisprudence, we
> cannot say "that the state court 'unreasonably applied
> clearly established Federal law'" by rejecting Cook's
> claim based on the consistency agreement. <u>Carey v.
> Musladin</u>, 549 U.S. 70, 127 S.Ct. 649, 654, 166 L.Ed.2d 482
> (2006).

<u>Cook</u>, 538 F.3d at 1017.

Thus, in this circuit, a plea agreement may require an

accomplice to testify fully and truthfully without violating the Due

Process Clause so long as the accused has the opportunity to cross-

examine and impeach the witness.  <u>Gallego v. McDaniel</u>, 124 F.3d

1065, 1077-78 (9th Cir. 1997).  "An agreement that requires a

witness to testify truthfully in exchange for a plea is proper so

long as 'the jury is informed of the exact nature of the agreement,

defense counsel is permitted to cross-examine the accomplice about

the agreement, and the jury is instructed to weigh the accomplice's

testimony with care.'"  <u>Allen v. Woodford</u>, 395 F.3d 979, 995 (9th

Cir. 2005) (quoting <u>United States v. Yarbrough</u>, 852 F.2d 1522, 1537

(9th Cir. 1988)); <u>accord</u>, <u>Reyes v. Lewis</u>, no. cv 10-1325-VAP (JCG),

2011 WL 2554519, *3-*4 (C.D.Cal. April 29, 2011), adopted 2011 WL

2554919 (June 28, 2011) (unpublished).

Although Petitioner argues that the testimony of the

accomplices and Ochoa should have been excluded because it was

unreliable, Petitioner does not provide authority for exclusion of

25

the evidence because of a witness's bias or self-interest.  With

respect to the admission of relevant evidence contended to be

unreliable, the primary federal safeguards are provided by the Sixth

Amendment's rights to counsel, compulsory process to obtain defense

witnesses, and confrontation and cross-examination of prosecution

witnesses; otherwise, admission of evidence in state trials is

ordinarily governed by state law.  Perry v. New Hampshire, - U.S. -,

132 S.Ct. 716, 723 (2012) (Due Process Clause does not require a

trial judge to conduct a preliminary assessment of reliability of

eyewitness identification made under suggestive circumstances not

arranged by the police).  The reliability of relevant testimony

typically falls within the province of the jury.  Id. at 728-29.

Absent improper police conduct or other state action, the

reliability of evidence may be tested through the normal procedures,

including the right to counsel and cross-examination, protective

rules of evidence, the requirement of proof of guilt beyond a

reasonable doubt, and jury instructions.  Id.

Even if, as Petitioner argues, the introduction of statements

made involuntarily by third party witnesses could offend due process

if coerced by the government, there is no evidence of any coercive

methods in this case that would render any statement or testimony

involuntary.  Likewise, there is no evidence that compels a

conclusion that the witnesses' testimony was false.  Under these

circumstances, Petitioner does not appear to have suffered any

prejudice and would not be entitled to habeas relief.  Cf. Cook v. Schriro, 538 F.3d at 1018; Morris v. Woodford, 273 F.3d 826, 836-37 (9th Cir. 2001), cert. den. Woodford v. Morris, 537 U.S. 941 (2002) (any error in admitting allegedly coerced accomplice testimony was rendered harmless by evidence of the Petitioner's admissions and corroborating physical evidence of guilt).  Here, giving due deference to the state court's factual findings, there was no evidence of coercion, perjured testimony, or deliberate deception to support a due process claim.  Further, the record contained independent evidence of Petitioner's guilt, including the eyewitness testimony of Vizcarra and more distant bystanders and physical evidence consistent with the accomplices' reports and testimony. The Court concludes that Petitioner suffered no prejudice that would warrant habeas relief.

> D.   Analysis of the State Court's Determination of Facts
> pursuant to 28 U.S.C. § 2254(d)(2)

Petitioner argues that the state court's findings of fact were unreasonable in light of the evidence before the state court. However, consideration of the findings in accordance with pertinent legal standards reveals that the state court's findings were reasonable despite the initial report of Pena that Arellano was the shooter, Brigg's testimony, and occasional inconsistencies in the statements of the numerous accomplices.

Pursuant to 28 U.S.C. § 2254(d)(2), a habeas petition may be

granted only if the state court's conclusion was an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Section 2254(d)(2) applies where the challenge is based entirely on the state court record or where the process of the state court is claimed to have been defective, such as challenges to the sufficiency of the evidence, or allegations that the state court's processes were defective or factual findings were omitted.  Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004).  For a determination of fact to be unreasonable, the state court's determination must be not merely incorrect or erroneous, but rather objectively unreasonable.  Id. at 999.  It is not sufficient that that reasonable minds might disagree with the determination or have a basis to question the finding; rather, a federal habeas court must find that the trial court's factual determination was such that a reasonable fact finder could not have made the finding.  Rice v. Collins, 546 U.S. 333, 340-42 (2006).  To conclude that a state court finding is unsupported by substantial evidence, a federal habeas court must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.  Taylor v. Maddox, 366 F.3d at 1000.  To determine that a state court's fact finding process is defective in some material way or non-existent, a federal habeas court must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the

28

state court's fact finding process was adequate.   Id.

Here, Petitioner disagrees with the statement of facts from the state court and relies instead on 1) inconsistent evidence in the record, and 2) declarations, including a declaration of Alvarado Arellano in which Arellano states that Petitioner was not the shooter, and a declaration of Petitioner in which Petitioner declares that he was not the shooter, was not a member of a criminal street gang, and knew that the accomplices prevaricated in order to obtain favorable plea bargains.  (Trav., doc. 38 at 14, 93-95.) However, the record contained not only the accomplices' testimony, but also corroborative testimony from persons in the area and consistent physical and expert evidence.  Applying the standards of appellate review, a tribunal could reasonably conclude that the finding that Petitioner was the shooter was supported by the record.

The declarations, which were not before the state court, are not subject to this Court's review in this proceeding.  In Murray v. Schriro, 745 F.3d 984, 1001 (9th Cir. 2014), the court reviewed challenges to state court findings that were based entirely on the record for "an unreasonable determination of the facts" pursuant to 28 U.S.C. § 2254(d)(2) without considering any new evidence as to claims adjudicated on the merits by the state court (citing Pinholster, 131 S.Ct. at 1401).

Based on the foregoing, it will be recommended that Petitioner's due process claim concerning introduction of the

statements of the accomplices and Ochoa be denied.

V.   Instruction on Accomplice Testimony and Related Claim
     Regarding the Ineffective Assistance of Counsel

Petitioner argues that his right to due process under the Sixth and Fourteenth Amendments was violated by the instructions given on corroboration of accomplice testimony.  Petitioner contends that the instruction did not correctly convey the requirement of corroboration because it permitted the jury to conclude that an accomplice's prior out-of-court statements could be used to corroborate the accomplice's in-court testimony.  Petitioner contends that the error was prejudicial because the only strong evidence against Petitioner was the accomplices' testimony. Petitioner raises the related claim that his counsel's failure to object to or otherwise to remedy the instructional error constituted ineffective assistance of counsel in violation of Petitioner's rights under the Sixth and Fourteenth Amendments.

A.   The State Court Decision

The last reasoned decision on this claim was the CCA's opinion, in which the CCA initially found that Petitioner had forfeited the claim because at trial the defense failed either to request a modification of the instruction or to submit a legally correct pinpoint instruction; however, the CCA concluded that there had been no constitutional violation.  (LD 8, 26-29.)  The CCA stated the following:

A. **The Jury was Correctly Instructed on Accomplice Corroboration.**

The court instructed the jury on accomplice testimony with CALCRIM Nos. 301, 318, and 335.

As given, CALCRIM No. 301 provided:

> "Except for the testimony of Raul Pena, Sergio Felix, Luis Avina Meza, and the out of court statements of Alvaro Arellano, which require supporting evidence, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."

CALCRIM No. 318 informed the jurors:

> "You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways: [¶] 1. To evaluate whether the witness's testimony in court is believable; [¶] AND [¶] 2. As evidence that the information in those earlier statements is true."

CALCRIM No. 335 instructed the jurors that Pena, Felix, Meza and Arellano were accomplices to the charged offenses. Then it stated:

> "You may not convict the defendant of [the charged offenses], or any lesser crime, based on the statement or testimony of an accomplice alone. You may use the statement or testimony of an accomplice to convict the defendant only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's statement or testimony [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commissions of the crimes."

Appellant argues that while CALCRIM Nos. 318 and 335 are generally correct, the instructions were misleading in this case because there were numerous accomplices who all

gave statements to the police. In appellant's view, CALCRIM Nos. 318 and 335 incorrectly permitted the jury to find "that the testimony of one accomplice was corroborated by the statements of another accomplice or that the testimony of one accomplice was corroborated by the statements of that same accomplice." Based on this premise, appellant asserts the court had a sua sponte obligation to modify these instructions and inform the jury that the required corroboration of an accomplice's testimony must be both independent of any prior out-of-court statements that were made by the accomplice and independent of both the testimony and prior out-of-court statements that were made by the other accomplices. As we will explain, this claim of instructional error is both procedurally defective and substantively meritless.

Procedurally, appellant forfeited the right to raise this issue on appeal because he did not seek modification of the instructions in the trial court or submit a legally correct pinpoint instruction. Section 1259 provides that we may review "any instruction given, refused or modified, even though no objection was made thereto" in the trial court. (§ 1259.) Even so, a defendant may not complain on appeal that a legally correct jury instruction was too general or incomplete unless he or she sought clarifying or amplifying language in the trial court. (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 364-365, 100 Cal.Rptr.3d 820 *(Tuggles); People v. Cleveland* (2004) 32 Cal.4th 704, 750, 11 Cal.Rptr.3d 236, 86 P.3d 302; *People v. Hart* (1999) 20 Cal.4th 546, 622, 85 Cal.Rptr.2d 132, 976 P.2d 683.)

Essentially, appellant is arguing that due to the unusually large number of accomplices who all made pretrial statements, the court had a sua sponte duty to modify the otherwise correct instructions in a way that avoided the potentially problematic interpretation he identified in his briefing.  Appellant reasons that such an instruction fell within the ambit of general principles of law closely and openly connected to the facts and necessary for the jury's understanding of the case. We disagree.

A trial court is not required to instruct sua sponte on specific points developed at trial. (*People v. Daya* (1994) 29 Cal.App.4th 697, 714, 34 Cal.Rptr.2d 884.) If appellant was concerned that under the unique facts of this case,

the jury needed additional instruction on accomplice corroboration, he was required to submit a special instruction addressing this point. "[D]efendant is not entitled to remain mute at trial and scream foul on appeal for the court's failure to expand, modify and refine standardized jury instructions." (*Ibid.*)

*Tuggles, supra*, 179 Cal.App.4th 339, 100 Cal.Rptr.3d 820 is directly on point. There, CALCRIM Nos. 318 and 335 were given without objection or request for modification. On appeal, Tuggles argued that when these instructions were read together, they "erroneously instructed the jury that an accomplice's testimony at trial could be corroborated by the same accomplice's prior out-of-court statements." (*Id.* at p. 363, fn. omitted.) The appellate court concluded the point was both forfeited and lacked merit. With respect to forfeiture, the court reasoned:

> "The gravamen of Tuggle's argument is a claim of improper 'completion of the instruction by the trial court.' To preserve the issue, Tuggles was required to request the additional language needed to complete the jury instructions. [Citation.] The lack of such a request by Tuggles forfeited the issue for review. [Citation.]" (*Tuggles, supra*, 179 Cal.App.4th at pp. 364-365, 100 Cal.Rptr.3d 820.)

The appellate court then considered the substantive point in an ineffective assistance of counsel context. It decided no reasonable juror would have understood CALCRIM Nos. 318 and 335 as permitting the witness to corroborate his own testimony. (*Tuggles, supra*, 179 Cal.App.4th at p. 365, 100 Cal.Rptr.3d 820.) Use of the word "independent" in CALCRIM No. 335 to describe the sort of evidence that could serve as corroboration negates the defendant's assertion that the instruction allowed the accomplice to corroborate his own testimony. Further, even if CALCRIM Nos. 318 and 335 were susceptible to this interpretation, "any mistaken impression was dispelled by the court's giving of CALCRIM No. 301." (*Ibid.*) "This instruction informed the jury that [the witness's] status as an accomplice disallowed his testimony to suffice for conviction without additional evidence in support." (*Id.* at p. 366.) With the additional consideration of CALCRIM No. 301, "no reasonable jury could have understood the instructions to allow an accomplice to corroborate

33

himself. [Citations.]" (*Id.* at p. 366.)

Appellant argues *Tuggles* is distinguishable because this case involves multiple accomplices and the prosecutor implied in his closing arguments that an accomplice's testimony could be corroborated by his pretrial statement and/or the testimony of other accomplices.

Neither of these factual differences pertains to the issue of forfeiture. We find *Tuggles* to be persuasive on that point. If appellant wanted additional instruction on accomplice corroboration or modification of generally correct instructions, it was incumbent on him to request it. Also, if appellant thought the prosecutor was misstating the law during closing arguments, he was affirmatively obligated to assert a timely objection and request admonishment. (*People v. Hill* (1998) 17 Cal.4th 800, 820, 72 Cal.Rptr.2d 656, 952 P.2d 673.)

Since appellant did not request modification of CALCRIM Nos. 318 or 335, did not offer a pinpoint instruction concerning multiple accomplices, and did not object to the prosecutor's closing argument on this basis, we conclude the point was not preserved for direct appellate review. (*Tuggles, supra*, 179 Cal.App.4th at pp. 364-365, 100 Cal.Rptr.3d 820.)

Furthermore, we agree with the reasoning in *Tuggles* that inclusion of CALCRIM No. 301 in the jury charge precluded the erroneous interpretation urged by appellant. The correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (*Estelle*); see, e.g., *People v. Solomon* (2010) 49 Cal.4th 792, 824, 112 Cal.Rptr.3d 244, 234 P.3d 501; *People v. Jones* (2003) 108 Cal.App.4th 455, 468, 133 Cal.Rptr.2d 358.) We must review jury instructions based on how a reasonable juror would construe them. (*People v. Clair* (1992) 2 Cal.4th 629, 688, 7 Cal.Rptr.2d 564, 828 P.2d 705.) The test on appeal is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution. [Citation.]" (*Estelle, supra*, 502 U .S. at p. 72.) Reasonable jurors would not have construed the language of CALCRIM Nos. 318 and 335 in the manner suggested by appellant. Since it is not reasonably

34

likely that the jury applied the instructions in a way
that violates the state or federal constitutions, this
claim of evidentiary error fails. (*Tuggles, supra*, 179
Cal.App.4th at pp. 365-366, 100 Cal.Rptr.3d 820.)

(LD 8, 25-29.)

    B.   <u>Analysis</u>

    Any challenge that Petitioner might have had that was based on

state law, such as compliance with Cal. Pen. Code § 1111 regarding

corroboration of accomplice testimony, is not subject to this

Court's review in this proceeding.  A challenge to a jury

instruction based solely on an error under state law does not state

a claim cognizable in federal habeas corpus proceedings.  <u>Estelle v.</u>

<u>McGuire</u>, 502 U.S. 62, 72 (1991).  A claim that an instruction was

deficient compared to a state model or that a trial judge

incorrectly interpreted or applied state law governing jury

instructions does not entitle one to relief under § 2254, which

requires violation of the Constitution, laws, or treaties of the

United States.  28 U.S.C. §§ 2254(a), 2241(c)(3).

    Further, Respondent asserts that any error is procedurally

barred from this Court's review.  In response to Respondent's

assertion that any claim of instructional error was procedurally

defaulted pursuant to California's rule requiring the defense to

challenge the instruction at trial, Petitioner argues that his

counsel was ineffective in failing to request modification of the

instructions and to submit an appropriate pinpoint instruction.

35

Respondent correctly contends that California's rule requiring a defense challenge to instructions at the trial level is recognized as independent and adequate such that a failure to comply with it results in forfeiture of the issue in a proceeding pursuant to 28 U.S.C. § 2254.[1] Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004); see Huff v. Martel, no. 2:08-cv-3053-JAM-TJB, 2010 WL 3608111, *10-*11 (E.D.Cal. Sept. 10, 2010) (unpublished).

However, it is also established that in a habeas case, the issue of procedural bar need not be resolved if another issue is capable of being resolved against the petitioner. Lambrix v. Singletary, 520 U.S. 518, 525 (1997). Likewise, the procedural default issue, which may necessitate determinations concerning cause and miscarriage of justice, may be more complex than the underlying issues in the case. In such circumstances, it may make more sense to proceed to the merits. See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002).

Here, because Petitioner also asserts ineffective assistance of counsel based on counsel's failure to challenge or correct the instructions, the Court deems it most efficient to proceed to the

---

[1] The doctrine of procedural default is a specific application of the more general doctrine of independent state grounds. It provides that when a state court decision on a claim rests on a prisoner's violation of either a state procedural rule that bars adjudication of the case on the merits or a state substantive rule that is dispositive of the case, and the state law ground is independent of the federal question and adequate to support the judgment such that direct review in the United States Supreme Court would be barred, then the prisoner may not raise the claim in federal habeas absent a showing of cause and prejudice or that a failure to consider the claim will result in a fundamental miscarriage of justice. Walker v. Martin, - U.S. -, 131 S.Ct. 1120, 1127 (2011); Coleman v. Thompson, 501 U.S. 722, 729-30 (1991); Bennett v. Mueller, 322 F.3d 573, 580 (9th Cir. 2003); Wells v. Maass, 28 F.3d 1005, 1008 (9th Cir. 1994). The doctrine applies regardless of whether the default occurred at trial, on appeal, or on state collateral review. Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

36

merits of Petitioner's claim concerning erroneous instructions regarding corroboration of accomplice testimony.

The only basis for federal collateral relief for instructional error is that the infirm instruction or the lack of instruction by itself so infected the entire trial that the resulting conviction violates due process. Estelle v. McGuire, 502 U.S. at 71-72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (it must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some right guaranteed to the defendant by the Fourteenth Amendment).   Further, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Estelle, 502 U.S. at 72.   In reviewing an ambiguous instruction, it must be determined whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution. Estelle, 502 U.S. at 72-73 (reaffirming the standard as stated in Boyde v. California, 494 U.S. 370, 380 (1990)).   The Court in Estelle emphasized that the Court had defined the category of infractions that violate fundamental fairness very narrowly, and that beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.   Id. at 72-73.

Moreover, even if there is instructional error, a petitioner is generally not entitled to habeas relief for the error unless it is prejudicial.   The harmless error analysis applies to instructional errors as long as the error at issue does not categorically vitiate all the jury's findings. Hedgpeth v. Pulido, 555 U.S. 57, 61 (2008)

(citing <u>Neder v. United States</u>, 527 U.S. 1, 11 (1999) (quoting <u>Sullivan v. Louisiana</u>, 508 U.S. 275 (1993) concerning erroneous reasonable doubt instructions as constituting structural error)). In <u>Hedgpeth v. Pulido</u>, the United States Supreme Court cited its previous decisions that various forms of instructional error were trial errors subject to harmless error analysis, including errors of omitting or misstating an element of the offense or erroneously shifting the burden of proof as to an element.  <u>Hedgpeth</u>, 555 U.S. 60-61.  To determine whether a petitioner pursuant to § 2254 suffered prejudice from such an instructional error, a federal court must determine whether a petitioner suffered actual prejudice by assessing whether, in light of the record as a whole, the error had a substantial and injurious effect or influence in determining the jury's verdict.  <u>Hedgpeth</u>, 555 U.S. at 62; <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993).

Petitioner contends that the instructions must be evaluated in light of the prosecutor's argument that the accomplices' testimony was corroborated by other evidence coming from the accomplices.  The prosecutor's argument will be further analyzed in connection with Petitioner's claims of prosecutorial misconduct.  However, in the context of the entire case, the Court will consider Petitioner's argument that the possibility that the jury understood the instructions concerning corroboration of accomplice testimony to permit corroboration by accomplice testimony itself was magnified by the multiplicity of accomplices, and the instructional error rendered his trial unfair because the only significant or strong evidence identifying Petitioner as the shooter came from the accomplices.

The Due Process Clause does not require corroboration of accomplice testimony.  United States v. Augenblick, 393 U.S. 348, 352 (1969).  Unless accomplice testimony is incredible or so insubstantial on its face that it results in a denial of fundamental unfairness, corroboration is not required by the Constitution or federal law.  Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000).

Here, the accomplices' testimony concerning Petitioner's shooting of the victim was corroborated substantially by the testimony and statements of Vizcarra, observations of neighbors and persons in the vicinity, and uncontroverted physical evidence.  The accomplices' testimony was consistent with the independent evidence. The record contained significant independent evidence that corroborated accomplice testimony.  It was not likely that the jurors understood the instructions to require independent corroboration of accomplice testimony and simultaneously to provide that accomplice testimony itself could provide that corroboration. The state court's conclusion that it was not likely that the jurors' understood the instructions to permit corroboration by other accomplice testimony was not objectively unreasonable and was not contrary to, or an unreasonable application of, clearly established federal law.

Here, as the independent evidence of Petitioner's culpability was strong and came from many sources, the Court concludes that Petitioner did not suffer any prejudice from the instructions on accomplice testimony.  Contrary to Petitioner's representations concerning the record, there was strong independent evidence that Petitioner was the shooter.  Before trial, Petitioner was identified as the shooter not only by Pena, Felix, and Meza, but also by

39

Vizcarra, who reported Petitioner took a gun and pointed it towards the ground where the victim was, which was followed immediately by the sound of three or more gunshots.  (8 RT 1726, 1742-43, 1746-47, 1788.)  Before trial, in addition to Felix, Pena, and Meza, various persons who were not accomplices reported that the shooter pulled out or pointed a gun down at the victim, who was on or close to the ground, and fired multiple gunshots in rapid succession.  (5 RT 1057, 1060, 1070 [Sabrina Lominario]; 4 RT 985, 990-91 [Marlena Phipps]; 8 RT 1742-43, 1741 [Vizcarra].)  Although Meza and Felix identified Petitioner as the shooter at trial, independent witnesses testified that the shooter pointed the gun down at the victim, who was down, and fired multiple gunshots in rapid succession.  (2 RT 208-09, 218-21, 233 [Lominario]; id. at 246, 253-54, 256 [Phipps]; id. at 348, 360-62, 427, 442-43 [Michael Steinberg].)  The independent witnesses' observations of the person with short hair were consistent with the accomplice's representations regarding Petitioner's conduct and appearance.  The physical evidence also supported the testimony concerning multiple shots from one gun fired by a person into a victim who was down.

Accordingly, it will be recommended that Petitioner's claim of instructional error regarding accomplice testimony be denied.

VI.   Ineffective Assistance of Counsel

Petitioner argues that his rights under the Sixth and Fourteenth Amendment were violated by counsel's failure to challenge the accomplice instructions.

A.   Legal Standards

The law governing claims concerning ineffective assistance of counsel is clearly established for the purposes of the AEDPA

40

deference standard set forth in 28 U.S.C. § 2254(d).  Premo v. Moore, - U.S. -, 131 S.Ct. 733, 737-38 (2011); Canales v. Roe, 151 F.3d 1226, 1229 n.2 (9th Cir. 1998).

To demonstrate ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments, a convicted defendant must show that 1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all the circumstances of the particular case; and 2) unless prejudice is presumed, it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.  Strickland v. Washington, 466 U.S. 668, 687-94 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).

With respect to this Court's review of a state court's decision concerning a claim of ineffective assistance of counsel, the Supreme Court has set forth the standard of decision as follows:

> To establish ineffective assistance of counsel "a defendant must show both deficient performance by counsel and prejudice." Knowles v. Mirzayance, 556 U.S. --,--,129 S.Ct. 1411, 1419, 173 L.Ed.2d 251 (2009). In addressing this standard and its relationship to AEDPA, the Court today in Richter, -- U.S., at -- - --, 131 S.Ct. 770, gives the following explanation:
>
> > "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' [Strickland,] 466 U.S., at 688 [104 S.Ct. 2052]. A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. Id., at 689 [104 S.Ct. 2052]. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the

41

defendant by the Sixth Amendment.' <u>Id.</u>, at 687
[104 S.Ct. 2052].

"With respect to prejudice, a challenger must
demonstrate 'a reasonable probability that, but
for counsel's unprofessional errors, the result
of the proceeding would have been different.'
...

" 'Surmounting <u>Strickland's</u> high bar is never an
easy task.' <u>Padilla v. Kentucky</u>, 559 U.S. --, --
[130 S.Ct. 1473, 1485, 176 L.Ed.2d 284] (2010).
An ineffective-assistance claim can function as
a way to escape rules of waiver and forfeiture
and raise issues not presented at trial [or in
pretrial proceedings], and so the <u>Strickland</u>
standard must be applied with scrupulous care,
lest 'intrusive post-trial inquiry' threaten the
integrity of the very adversary process the
right to counsel is meant to serve. <u>Strickland</u>,
466 U.S., at 689-690 [104 S.Ct. 2052]. Even
under <u>de novo</u> review, the standard for judging
counsel's representation is a most deferential
one. Unlike a later reviewing court, the
attorney observed the relevant proceedings, knew
of materials outside the record, and interacted
with the client, with opposing counsel, and with
the judge. It is 'all too tempting' to 'second-
guess counsel's assistance after conviction or
adverse sentence.' <u>Id.</u>, at 689 [104 S.Ct. 2052];
see also <u>Bell v. Cone</u>, 535 U.S. 685, 702, 122
S.Ct. 1843, 152 L.Ed.2d 914 (2002); <u>Lockhart v.
Fretwell</u>, 506 U.S. 364, 372, 113 S.Ct. 838, 122
L.Ed.2d 180 (1993). The question is whether an
attorney's representation amounted to
incompetence under 'prevailing professional
norms,' not whether it deviated from best
practices or most common custom. <u>Strickland</u>, 466
U.S., at 690, 104 S.Ct. 2052.

"Establishing that a state court's application
of <u>Strickland</u> was unreasonable under § 2254(d)
is all the more difficult. The standards created
by Strickland and § 2254(d) are both 'highly
deferential,' <u>id.</u>, at 689 [104 S.Ct. 2052];
<u>Lindh v. Murphy</u>, 521 U.S. 320, 333, n. 7, 117
S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the

1
2
3
4
5
6
7
8

> two apply in tandem, review is 'doubly' so,
> <u>Knowles</u>, 556 U.S., at ----, 129 S.Ct., at 1420.
> The <u>Strickland</u> standard is a general one, so the
> range of reasonable applications is substantial.
> 556 U.S., at ---- [129 S.Ct., at 1420]. Federal
> habeas courts must guard against the danger of
> equating unreasonableness under <u>Strickland</u> with
> unreasonableness under § 2254(d). When § 2254(d)
> applies, the question is not whether counsel's
> actions were reasonable. The question is whether
> there is any reasonable argument that counsel
> satisfied <u>Strickland's</u> deferential standard."

9
10

<u>Premo v. Moore</u>, 131 S.Ct. at 739-40 (quoting <u>Harrington v. Richter</u>, 131 S.Ct. 770 (2011)).

11

B.   <u>Analysis</u>

12
13
14
15

Respondent contends that Petitioner's claim of ineffective assistance regarding accomplice instructions was never presented to the state courts and thus was not exhausted, and that in any event, Petitioner's claim fails on the merits.

16
17
18
19
20
21
22
23
24
25
26
27
28

The claim was not addressed in the CCA's decision (LD 8, 25-29) or in Petitioner's petition for writ of habeas corpus filed in the CSC (LD 12.).  Nevertheless, as the foregoing discussion concerning Petitioner's claim of instructional error shows, the California courts properly concluded that it was not reasonably likely that the jury had applied the instructions in a manner that violated the Constitution.  Considering the state court decision in this case and the holding in the <u>Tuggles</u> case discussed by the CCA in its decision, the record reflects it is not reasonably probable that the trial court would have ruled favorably on any challenge lodged by trial counsel to the instructions.  See <u>Styers v. Schriro</u>, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008) (a petitioner claiming ineffective assistance based on counsel's failure to file a particular motion

must demonstrate "a likelihood of prevailing on the motion," and "a reasonable probability that the granting of the motion would have resulted in a more favorable outcome in the entire case"). Here, counsel could have made a reasonable tactical decision not to challenge the instructions or argument to minimize the likelihood that the prosecutor would highlight the independent evidence even further in responsive argument. Further, in light of the independent evidence of Petitioner's guilt in the record, it does not appear that any theoretical ambiguity in the instruction prejudiced Petitioner.

The Court concludes that counsel's failure to challenge the accomplice instructions did not constitute ineffective assistance of counsel. Petitioner has not shown that counsel's omission resulted in prejudice. Accordingly, it will be recommended that Petitioner's claim of ineffective assistance of counsel relating to accomplice instructions be denied.

VI.   Admission of the Autopsy Report

Petitioner claims that admission of an autopsy report violated his rights to confrontation and cross-examination guaranteed by the Sixth and Fourteenth Amendments because the report was testimonial, and it was admitted without the testimony of the pathologist who performed the autopsy.

A.   The State Court's Decision

The last reasoned decision on the Confrontation Clause claim must be identified. Although the CCA addressed the general issue, the CCA did not decide the precise issue presented by Petitioner; the CCA instead reviewed the evidence but concluded that any alleged

44

Confrontation Clause error was harmless beyond a reasonable doubt.[2]

The CCA did not determine whether there was an actual Confrontation

Clause error.  A state court decision cannot be classified as an

"adjudication on the merits" within the meaning of § 2254(d)(1) if

the state court failed to resolve all determinative issues of

federal law.  In analogous circumstances, a state court's decision

on the prejudice prong of an ineffective assistance claim does not

constitute a decision on whether there was unreasonable, sub-

standard conduct of counsel; the portion or element of the claim

that was not analyzed is determined de novo by this Court.  Porter

v. McCollum, 558 U.S. 30, 37-38 n.6, 39 (2009) (per curiam);

Rompilla v. Beard, 545 U.S. 374, 390 (2005).

Arguably, the last reasoned decision was the decision of the

trial court, which admitted the evidence over objection.  Medley v.

Runnels, 506 F.3d 857, 863 (9th Cir. 2007) (concluding that where

the state appellate courts had not discussed an issue regarding

evidence concerning a flare gun, the state trial court "effectively

ruled on this issue when it decided that if the prosecution

presented evidence as to how a flare gun functions, then the issue

---

[2] The CCA concluded that admission of the autopsy report and Dr. Lawrence's testimony summarizing its contents did not prejudice the Petitioner.  The court reasoned that the error was harmless beyond a reasonable doubt in light of the entire record because the cause and manner of the victim's death was undisputed at trial, where the defense suggested that Arellano was the killer and thereby attempted to raise a reasonable doubt as to the identity of the shooter; there was independent testimony about the autopsy by percipient witnesses who were subject to cross-examination by defense counsel; the contents of the doctor's testimony and autopsy report were largely cumulative to the percipient witnesses' testimony and physical evidence recovered at the crime scene; all the evidence corroborated the contents of the autopsy report and the doctor's testimony concerning the victim's injuries, the directional path of the bullets, and the cause of death; and Petitioner did not suggest any new evidence that was available only if Dr. Schmunk had been cross-examined.  (LD 8, 22-25.)

of whether the flare gun was a firearm would be moot).  In <u>Medley</u>,
the Court of Appeals concluded that the terse pretrial ruling
constituted the last reasoned decision under <u>Ylst</u> and would be the
ruling reviewed in habeas corpus.  <u>Medley v. Runnels</u>, 506 F.3d at
863.

Even if a state court has failed to set forth its reasoning, a
federal habeas court must determine what arguments or theories could
have supported the state court's decision and then determine whether
fairminded jurists could disagree that those arguments or theories
are inconsistent with the holding in a prior decision of this Court.
<u>Harrington v. Richter</u>, 131 S.Ct. at 786.  When the state court does
not supply reasoning for its decision, this Court does not conduct
<u>de novo</u> review but rather conducts an independent review of the
record to ascertain whether the state court's decision was
objectively unreasonable.  <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th
Cir. 2013), <u>cert. den.</u> <u>Walker v. Chappell</u>, 134 S.Ct. 514 (2013).

B.  <u>Analysis</u>

The Confrontation Clause of the Sixth Amendment, made binding
on the states by the Fourteenth Amendment, provides that in all
criminal cases, the accused shall enjoy the right to be confronted
with the witnesses against him.  <u>Pointer v. Texas</u>, 380 U.S. 400
(1965).  The main purpose of confrontation as guaranteed by the
Sixth Amendment is to secure the opportunity for cross-examination
to permit the opponent of the party presenting a witness to test the
believability of the witness and the truth of his or her testimony
by examining the witness's story, testing the witness's perceptions

46

and memory, and impeaching the witness.  Delaware v. Van Arsdall,

475 U.S. 673, 678 (1986); Davis v. Alaska, 415 U.S. 308, 316 (1974).

Even if there is a violation of the right to confrontation, habeas

relief will not be granted unless the error had a substantial and

injurious effect or influence in determining the jury's verdict.

Ocampo v. Vail, 649 F.3d 1098, 1114 (9th Cir. 2011), cert. den.,

Warner v. Ocampo, 131 S.Ct. 62 (2012); Jackson v. Brown, 513 F.3d

1057, 1084 (9th Cir. 2008) (citing Brecht v. Abrahamson, 507 U.S. at

637).

        Petitioner relies on Crawford v. Washington, 541 U.S. 36, 59

(2004), holding that testimonial statements of witnesses absent from

trial may be admitted only where the declarant is unavailable and

the defendant has had a prior opportunity to cross-examine the

witness; and Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009),

holding that notarized, sworn certificates of analysis prepared by

laboratory analysts that under state law constitute prima facie

evidence come within the core class of testimonial documents

protected by the Sixth Amendment.  Petitioner contends that in

argument to the jury, the prosecutor here repeatedly referred to the

nature of the injuries found in the autopsy, specifically,

lacerations, abrasions, glass, the bullet removed from the victim

that was linked to the gun recovered by police, and the pattern of

five wounds to the victim's back as reflecting the victim's having

been punched, kicked, and shot while down.  The prosecutor also reminded the jurors that they could observe the autopsy photographs.

However, Petitioner may not rely on Melendez-Diaz or other Supreme Court decisions made after the date of the state court's merits decision.  Clearly established federal law within the meaning of § 2254(d)(1) is the Supreme Court case law that existed on the day the state court rendered its merits adjudication.  Greene v. Fisher, 132 S. Ct. 38, 44 (2011).  Section 2254(d)(1) requires federal courts to "focu[s] on what a state court knew and did," and to measure state-court decisions "against this Court's precedents as of 'the time the state court renders its decision.'"  Id. (quoting Cullen v. Pinholster, 131 S.Ct. at 1399).  A later affirmance on alternative procedural grounds or a later decision by a higher state court denying review would not alter this.  Id. at 45.

Here, the state trial court's merits adjudication occurred on January 20, 2009.  (2 RT 347, 381-82, 384-85; II CT 352-53).  In 2004, five years before the adjudication, in Crawford v. Washington, 541 U.S. at 53-54, the Court held that the Confrontation Clause bars the admission of testimonial hearsay unless the declarant is unavailable and the accused had "a prior opportunity for cross-examination."  The Crawford holding abrogated in part the prior rule that the admission of testimonial hearsay did not violate the Confrontation Clause if the declarant was unavailable and the statement fell within a "firmly rooted hearsay exception" or otherwise bore indicia of reliability.  Ohio v. Roberts, 448 U.S. 56, 66 (1980).  Although Crawford did not define "'testimonial' or

48

'nontestimonial,' it made clear that the Confrontation Clause was concerned with 'testimony,' which 'is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,' and noted that '[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.'" Delgadillo v. Woodford, 527 F.3d 919, 927 (9th Cir. 2008) (quoting Crawford, 541 U.S. at 51 (first alteration in original) (internal quotation marks omitted)).

However, Melendez-Diaz v. Massachusetts, relied on by Petitioner, was not decided until June 25, 2009, after the state court's merits decision in the present case. Melendez-Diaz, 557 U.S. 305. Because the clearly established federal law based on Crawford did not delineate what was testimonial, a state court decision at that time that admitting an autopsy report without confrontation or cross-examination of the person who authored the report was not contrary to, or an unreasonable application of, clearly established federal law where another forensic pathologist from the laboratory gave expert testimony based on the data in the report. See, McNeiece v. Lattimore, no. ED CV 07-0951 RGK (FMO), 2009 WL 1464368, *7-*10 (C.D.Cal. May 22, 2009) (unpublished); Rogovich v. Schriro, no. CV-00-1896-PHX-ROS, 2008 WL 2757362, at *6 (D. Ariz. July 14, 2008), aff'd., Rogovich v. Ryan, 694 F.3d 1094 (9th Cir. 2012), cert. den. 134 S.Ct. 93 (2013); cf. Flournoy v. Small, 681 F.3d 1000, 1004 (9th Cir. 2012), cert. den. 133 S.Ct. 880 (2013) (an analogous state court decision that found no Confrontation Clause violation in the admission of a scientist's testimony based on the tests and reports of other crime laboratory

49

workers was not contrary to, or an unreasonable application of, clearly established federal law, and citing Meras v. Sisto, 676 F.3d 1184, 1188 (9th Cir. 2012) (Crawford did not clearly establish whether a forensic laboratory report was testimonial)).

Even considering the more recent holdings in Melendez-Diaz and Bulcoming v. New Mexico, 564 U.S. -, 131 S.Ct. 2705 (2011) (holding testimonial scientists' unsworn, formal certificates of analysis made for the purpose of introduction in evidence to establish proof of the results of the analysis), a fairminded jurist could argue that it was uncertain whether the Supreme Court would classify autopsy reports as testimonial, or would find fundamentally unfair the admission of the testimony of another expert who relied in part on an autopsy report and in part on independent evidence of the substance and procedure of the autopsy. See, Flournoy v. Small, 681 F.3d at 1005; Vega v. Walsh, 669 F.3d 123, 127-28 n.2 (2d Cir. 2012); Nardi v. Pepe, 662 F.3d 107, 112, (1st Cir. 2011).

In any event, regardless of the date of the relevant state court decision or the status of the law as clearly established, Petitioner has not shown that any Confrontation Clause violation was prejudicial. Although Dr. Lawrence did not perform the autopsy, he was the laboratory's owner and custodian of records and was a pathologist in the laboratory who had practiced for thirty-six years, performed over 8,000 autopsies, and testified in court over 1,000 times (2 RT 379-81, 384-85); thus, he had personal knowledge regarding the laboratory's forensic and record-keeping procedures. Further, Lawrence had expertise regarding Petitioner's wounds based not only on the autopsy report, but also by the doctor's own observations and interpretations of the photographs that had been

50

taken during the course of the autopsy.  (Id. at 382).[3]

It is true that Lawrence did testify regarding matters reflected in the autopsy report, including the victim's clothing, height and weight, and his general health before death as well as the presence of blunt force injuries consistent with a fight, a total of seven gunshot wounds, glass fragments in the victim's forehead and elbow, and an absence of burn marks near the entrance wounds.  (Id. at 387-389, 414-15.)  He testified that the report indicated that the bullets hit the victim's lungs, liver, adrenal gland, spinal column, diaphragm, and aorta, causing significant internal bleeding; and the cause of death was shock and hemorrhage due to multiple gunshot wounds.  (Id. at 402-03, 420-23.)  Further, the report indicated that some of the shots were fired in a downward direction.  (Id. at 414-15.)

However, there was independent, non-hearsay evidence of the autopsy procedures and the authenticity of the autopsy photographs. A deputy sheriff testified he was present during the autopsy with two members of the district attorney's staff and an identification officer.  The deputy confirmed the presence and location of the bullet holes in the victim's body and other injuries; the removal by Dr. Schmunk, the pathologist performing the autopsy, of a bullet, which the deputy identified, from the area of the victim's chest cavity; and the deputy's direction to Officer Brown to take the autopsy photographs (People's exhs. nos. 9 through 26).  He identified the matters (injuries and clothing, personal effects, and

_____

[3] Lawrence testified that the very purpose of documenting the investigation into the cause and circumstances of the victim's death was to permit another pathologist to interpret the phenomena recorded and testify regarding them if something happened to the examining pathologist.  (Id.at 384-85.)

debris removed from the body) depicted in the photographs and removed from the body.  (4 RT 748-49, 751-54, 756-59.)  Another law enforcement officer who arrived at the scene before the victim died testified to observing the victim lying face down on the sidewalk and gasping for air; seeing bullet wounds and blood on his right side, back, and chest; and learning of the victim's death shortly thereafter.  (2 RT 195-98, 202.)

Physical evidence consistent with the autopsy report was also introduced with testimony as to the location of the evidence at the scene, including the bullet fragment found in the victim's shirt, the shirt with seven bullet holes that were close to each other in a pattern like a half-circle, six .380-caliber cartridge casings found in a half-circle in the intersection on the south side of Kern Street, a blood stain on the sidewalk and gutter behind the casings, four bullet impact marks next to the corner to the left of the blood stain, and associated bullet slugs.  (4 RT 880, 883, 886, 889, 895, 897-88; 5 RT 1020-25, 1030-35, 1040-47, 1050-57; 7 RT 1597.)  The locations of the casings, bullet slugs, and bullet impact marks indicated that the shooter was standing on the corner of Kern and P Streets, facing north or northwest when he fired the gun, and that he shot down at the ground. (5 RT 1022, 1077-78.)

Further, Lawrence also testified based on his observation and interpretation of autopsy photographs that represented phenomena that were consistent with matters reported in the report.[4]  Lawrence testified that the photographs showed abrasions on the victim's arm, blood or lacerations on his elbow, abrasions on his finger and

---

[4] Lawrence had reviewed the photographs in order to prepare diagrams of the wounds. (2 RT at 389.)

forearm, scratches on the backs of his finger and left hand, bruises and abrasions on his head and face, tempered glass embedded in his forehead, gunshot wounds to his abdomen and arm, a pattern of five similar-looking gunshot entrance wounds with a similar direction in the upper body grouped in an area twelve or fifteen inches in size, four exit wounds in the left side of his body, one bullet recovered in the soft tissues of the left flank, and lividity in his body. (2 RT 389-403.)  Based on the autopsy photos, Dr. Lawrence opined that the injuries were consistent with a fight or fall, the injuries to the victim's head and face were consistent with falling on a hard object, and the gunshots to his abdomen were likely fired in rapid succession with slight if any movement between the assailant and the victim during the shooting; further, the shooter fired from somewhere to the rear and right of the victim.  (2 RT 395, 398, 403, 409, 412, 419-20, 422-23.)

Here, independent of the autopsy report, there was evidence of the nature and severity of the victim's wounds from physical evidence at the scene and from the testimony of other persons who were actually present at the crime scene or at the autopsy. Petitioner has not identified any material factual dispute with respect to the injuries, the opinion that the victim died with five gunshots, or the related physical evidence.

Petitioner has neither suggested what additional information could have been elicited, nor shown that admission of the report had any substantial or injurious influence or effect in determining the jury's verdict.  Accordingly, it will be recommended that Petitioner's claim that his rights under the Confrontation Clause were violated be denied.

VIII.   <u>Flight Instruction</u>

Petitioner argues he suffered a violation of his right to a jury trial and to due process guaranteed by the Sixth and Fourteenth Amendments when the jury was instructed that Petitioner's flight to Mexico could be considered to demonstrate consciousness of guilt. Petitioner argues that the instruction should not have been given because there was no evidence that Petitioner knew he was suspected or accused of the murder when he left for Mexico.  Petitioner argues that the instruction allowed the jury to consider flight that was wholly unrelated to the charges.  In addition to the federal Constitution, Petitioner relies on state constitutional, statutory, and case law in support of this contention.  (FAP, doc. 22, 56-59.)

As set forth above, Petitioner's claim of instructional error is not cognizable in this proceeding.  Further, Respondent contends this claim was not exhausted in the state courts because in presenting the issue to the CSC, Petitioner did not refer to a specific constitutional guarantee, but rather only argued that it "would create an impermissible inference in violation of the Federal Constitution."  (LD 10, 15; see <u>id.</u> at ii, 14-16.)

In the interest of economy, the Court will exercise its discretion to forego an examination of the exhaustion issue and to proceed directly to consider Respondent's briefing to the effect that even if Petitioner had exhausted state court remedies as to a cognizable federal claim, the state court's denial of the claim on the merits was not objectively unreasonable.

A.   <u>The State Court Decision</u>

The CCA upheld the trial court's decision to instruct the jury regarding flight as follows:

**B. <u>Inclusion of a Flight Instruction in the Jury Charge was Proper.</u>**

### 1. Facts.

The prosecution presented evidence that on July 13, 2004, appellant spoke with his probation officer and told him he wanted to go with his mother to visit an aunt in Arizona. Based on this representation, the probation officer gave appellant permission to leave California from July 16, 2004 to August 6, 2004. Appellant agreed to contact his probation officer on August 6, 2004. Appellant did not go to Arizona with his mother and never contacted his probation officer again.

On July 14, 2004, the police attempted to locate appellant at his mother's residence in Modesto and his father's residence in Salinas. On July 15, 2004, a bench warrant was issued for appellant's arrest. On July 20, 2004, appellant's mother told the police that she did not know where appellant was.

In September 2006, police officers confirmed that appellant was living in Uruapan, Mexico. Federal agents arrested appellant, who was using a different name. Appellant was returned to the United States in custody.

Over defense objection, the court instructed on flight by giving a modified version of CALCRIM No. 372. The court omitted the portion of CALCRIM No. 372 concerning flight after the defendant has been accused of committing the charged crimes. As given, the instruction provided:

> "If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

### 2. The flight instruction was supported by the evidence.

Appellant argues the flight instruction should not have been given because he did not leave California immediately after the murder. Also, he contends there is no proof of

55

guilty knowledge. Appellant asserts that when he left California, he was "wholly unaware that he [was] under suspicion of the charged crime[s]." Neither of these contentions is persuasive.

" '[A] flight instruction is proper whenever evidence of the circumstances of defendant's departure from the crime scene or his usual environs,... logically permits an inference that his movement was motivated by guilty knowledge.' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 470, 48 Cal.Rptr.2d 525, 907 P.2d 373.) Flight requires a purpose to avoid being observed or arrested. A flight instruction does not assume that flight was established. It leaves this factual determination and its significance to the jury. The facts of each case determine whether it is reasonable to infer that flight shows consciousness of guilt. (*People v. Mason* (1991) 52 Cal.3d 909, 941, 277 Cal.Rptr. 166, 802 P.2d 950 (*Mason*).)

Our Supreme Court has rejected any "inflexible rules about the required proximity between crime and flight." (*Mason, supra*, 52 Cal.3d at p. 941, 277 Cal.Rptr. 166, 802 P.2d 950 [four-week delay]; see also, e.g., *People v. Santo* (1954) 43 Cal.2d 319, 329–330, 273 P.2d 249 [one-month delay].) There is not a "defined temporal period within which the flight must be commenced." (*People v. Carter* (2005) 36 Cal.4th 1114, 1182, 32 Cal.Rptr.3d 759, 117 P.3d 476 [delay of a few days].) Given the circumstances of this case, appellant's sudden departure from the country occurred in sufficient proximity to the murder to allow a flight instruction. Appellant killed Neuman on the night of July 10, 2004. On or about July 13, 2004, appellant fled the area. "Common sense ... suggests that a guilty person does not lose the desire to avoid apprehension for offenses as grave as" murder after only a few days. (*Mason, supra*, 52 Cal.3d at p. 941, 277 Cal.Rptr. 166, 802 P.2d 950.)

Also, the jury could reasonably infer that appellant's flight to Mexico was motivated by guilty knowledge and appellant's purpose was to avoid being questioned, detained or arrested for shooting Neuman. Soon after appellant killed Neuman, he lied to his probation officer to obtain permission to leave the state for two weeks. It reasonably can be inferred that appellant made up the story about visiting an aunt so the probation officer would not know that he had fled the country and alert

authorities when he failed to report to the probation
officer for their regularly scheduled meetings.

Accordingly, we conclude inclusion of the flight
instruction in the jury charge was proper and did not
infringe appellant's constitutional rights to a fair trial
and due process of law.

(LD 8, 29-31.)

      B.  Analysis

Here, the modified version of CALCRIM 372 that was given

suggested to the jury that it was possible to conclude that

Petitioner fled and that his flight evinced consciousness of guilt,

but it did not require the conclusion.  The instruction did not

require the jury to consider the evidence or direct the finding of

any particular fact, and it permitted the jury to reject the

evidence or to accept it as true and determine the weight to which

it was entitled.  Thus, the instruction was a "permissive inference

instruction," a form of instruction that is generally acceptable

unless the conclusion the instruction suggests "is not one that

reason and common sense justify in light of proven facts before the

jury."  Francis v. Franklin, 471 U.S. 307, 314-15 (1985).

Here, Petitioner's deceptive representations to his parole

officer concerning his travel plans and destination as well as the

timing and secrecy of his departure to Mexico warranted the

conclusion that Petitioner fled as a result of his having shot the

victim and was motivated by a consciousness of guilt.  The fact that

Petitioner had not been formally accused of the crime did not

attenuate the otherwise rational inferences in view of additional circumstances that strongly supported inferences of flight and consciousness of guilt.  The evidence supported providing the instruction, and the instruction respected the jury's role as fact finder.

More specifically, the Court is aware of no clearly established federal law that prohibits the giving of the flight instruction in the circumstances of Petitioner's case.  The Ninth Circuit has repeatedly confirmed the constitutionality of similar flight instructions.  See, e.g., Karis v. Calderon, 283 F.3d 1117, 1131-32 (9th Cir. 2002) (instructing the jury on flight, even though the trial court refused to advise the jury of possible reasons for flight other than consciousness of guilt, was not fundamentally unfair and did not violate due process); Houston v. Roe, 177 F.3d 901, 910 (9th Cir. 1999) (instructing the jury on flight was not unconstitutional because there is no clearly established federal law as determined by the Supreme Court that prohibits giving a flight instruction when the defendant admits committing the act charged); McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994) (instructing on flight was proper even though there was an issue as to identity of the person fleeing where the prosecution made a strong showing that it was the defendant who fled); cf. Flores v. Stainer, no. 1:11-cv-00190-BAM-HC, 2012 WL 3143874, *31-32 (E.D.Cal. Aug. 1, 2012) (unpublished) (noting there is no clearly established federal law

that the flight instruction lessens the burden of proof in violation of the Sixth and Fourteenth Amendments); United States v. Harrison, 585 F.3d 1155, 1159–60 (9th Cir. 2009) cert. den., Harrison v. United States, 559 U.S. 958 (2010) (instructing on flight was not erroneous under the circumstances where the instruction "permitted the jury to draw a reasonable inference; it did not require an unreasonable one") and "did not require an unreasonable [inference]").  Indeed, the Ninth Circuit has recognized that where, as here (LD 3, 11 RT 2533-36), the instruction is accompanied by the standard instructions concerning the burden of proof, circumstantial evidence, and the drawing of inferences, the instruction may benefit defendants because it reminds jurors that evidence of flight is not, by itself, sufficient to support a finding of guilt, and requires an inference of consciousness of guilt only if flight is proven. Karis, 283 F.3d at 1132; Harrison, 585 F.3d at 1160; McMillan, 19 F.3d at 469.

Considering the flight instruction in the context of the evidence introduced at trial and the instructions as a whole, the instruction did not render Petitioner's trial fundamentally unfair. Cf. Palma v. Harrington, No. CV 11-5728-JHN (E), 2012 WL 1570805, *7-*10 (C.D.Cal. May 2, 2012) (unpublished).  Accordingly, it will be recommended that Petitioner's claim concerning the flight instruction be denied.

///

59

IX.   Ineffective Assistance of Counsel regarding Seating
      of Law Enforcement Investigators and Witnesses at Trial

Petitioner argues he suffered a denial of his right to the effective assistance of counsel when his counsel failed to object to the seating of two witnesses (the prosecutor's lead investigator and gang expert) at the prosecutor's table during trial.  Petitioner contends that the presence of the witnesses at the prosecutor's side throughout the trial gave an unfair advantage to the prosecution and rendered his trial fundamentally unfair.

This claim was not addressed in the CCA's decision on direct appeal.  (LD 8.)  Petitioner raised the issue in his petition for writ of habeas corpus filed in the CSC.  (LD 12, ground 1.)  The CSC summarily denied the petition without any statement of reasoning or authority.  (LD 13.)

A state court adjudicates a claim on the merits when it decides the petitioner's right to relief on the basis of the substance of the constitutional claim raised, rather than denying the claim because of a procedural or other rule precluding state court review of the merits.  Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).  A state court need not issue an opinion on a claim for a claim to be adjudicated on the merits within the meaning of § 2254(d); rather, a state court's denial of an original petition for writ of habeas corpus without a statement of reasons is presumed to have been adjudicated on the merits in the absence of any indication or state law procedural principles to the contrary.  Harrington v. Richter, 131 S.Ct. at 784-85.  The presumption may be overcome when there is

reason to think some other explanation for the state court's decision is more likely.  Id. at 785.  Where a petitioner has failed to show that the California Supreme Court's decision did not involve a determination of the merits of his claim, a summary denial of relief will thus be considered to be an adjudication on the merits.  Id.

Here, the CSC's silent denial was an adjudication on the merits within the meaning of § 2254(d)(1) which warrants deferential review under § 2254(d)(1).

Petitioner does not dispute the pertinent facts as summarized by Respondent in the answer, which are as follows:

> On January 8, 2009, the court heard pretrial motions in limine. (1 CT 270.)
>
> At the beginning of the hearing, the court asked the prosecutor, Marlisa Ferreira, about the identity of the man sitting next to her. Ferreira introduced the man as Frolian Mariscal, an investigator with the district attorney's gang task force. Ferreira explained that Mariscal would be the prosecution's gang expert for the trial, and her lead investigator was Marc Nuno, a sheriff's detective. Ferreira also explained that, at different stages of the trial, the investigators would change. (1 RT 101.)
>
> During trial, an investigator, usually Nuno or Mariscal, sat at the prosecution's table, and the defense investigator sat at the defense's table. (1 RT 153; 2 RT 193; 3 RT 485, 612; 4 RT 734, 856; 5 RT 999, 1131; 6 RT 1231, 1356; 7 RT 1469, 1596; 8 RT 1726, 1845; 9 RT 1967, 2082; 10 RT 2236, 2361; 11 RT 2511, 2576.)

(Ans., doc. 28, 44:4-13.)  Further, it appears to be undisputed that Officer Nuno testified to his processing of the crime scene and additional investigation, including taking statements from co-participants that identified Petitioner as the shooter and attempting to locate Petitioner after he left the jurisdiction.  It

is also undisputed that Officer Mariscal provided extensive expert testimony as a gang expert, including identifying Petitioner as an active participant in a named criminal street gang and concluded that the murder was committed for the benefit of a criminal street gang.

Petitioner argues that the presence of the two officers deprived him of an opportunity guaranteed by the Sixth Amendment to determine his guilt solely based on the evidence introduced at trial, as distinct from official suspicion, accusation, continued custody, or other extraneous circumstances. See, Holbrook v. Flynn, 475 U.S. 560, 567-72 (1986) (presence of four uniformed and armed officers in the courtroom during trial was not an inherently prejudicial practice, such as shackling, that should be permitted only when justified by an essential state interest specific to each trial because of the possibility of a wide range of inferences, unrelated to the defendant, from the presence of the guards such that there was no unacceptable risk of impermissible factors coming into play). Petitioner relies on Turner v. State of Louisiana, 372 U.S. 466 (1965), in which the Court held that the defendant had been denied a fair trial before an impartial tribunal where two deputy sheriffs who gave key testimony leading to the defendant's conviction and whose credibility was in issue, had charge of jury during the trial and had fraternized with them outside courtroom during performance of their duties in what was described as "a continuous and intimate association throughout a three-day trial-—an association which gave these witnesses an opportunity... to renew old friendships and make new acquaintances among the members of the

jury."  Id. at 473.  The Court focused on the additional fact that the relationship of the witnesses to the jurors was that of official guardians, a position that naturally fostered the confidence of the jurors in those guardians.  Id. at 474.

Under California law, where a party to an action is an entity other than a natural person, the trial court has the discretion to permit an officer or employee of the party to attend trial; in fact, failure to permit a prosecutor's investigator to remain in court has been held to be an abuse of discretion.  See, Cal. Evid. Code § 777(a)-(c); People v. Gonzalez, 38 Cal.4th 932, 950-51 (2006).  Further, Petitioner does not dispute that a defense investigator sat at the defense table during the trial.

Although Petitioner argues that the presence of the testifying law enforcement officers was like wearing prison garb or similar to the presence of supporters wearing buttons in favor of one side of the case, he does not point to any improper conduct by the investigators.  The fact that the investigators also testified in various capacities does not necessarily relate to their presence in the courtroom, which is permitted for a different purpose, namely, for the assistance of the prosecutor.  The inferences to be drawn from the presence of the officers were not so narrow and focused that the presence of the officers raised any significant likelihood of the intrusion of extraneous matters that would render their presence inherently prejudicial.

The failure to make a motion that is legally meritless and thus futile does not constitute conduct falling below reasonable

professional norms and does not result in prejudice.  Matylinsky v. Budge, 577 F.3d 1083, 1094 (9th Cir. 2009).  Here, the presence of the investigators was permitted under state law that was promulgated pursuant to the state's interest in defining criminal procedures.  The officers' presence did not result in any inherent or demonstrable prejudice to Petitioner.  Petitioner's counsel was not required under clearly established federal law to object to the presence of the investigators, and the objection would not have been successful under state law.  Thus, the state court's denial of Petitioner's ineffective assistance claim based on the failure to object was not contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, it will be recommended that Petitioner's ineffective assistance claim relating to the presence of the witnesses at counsel's table be denied.

Petitioner's related claim that the presence of the investigating officers constituted vouching by the prosecutor also fails because the record does not reflect that the presence of the officers constituted a representation by the prosecutor of the credibility of the officers.

X.  Ineffective Assistance of Counsel in Failing to Object
    to Autopsy Photographs

Petitioner argues that his counsel was ineffective for failing to object to the admission of photographs of the victim taken during the autopsy.  Petitioner does not describe the precise matter

64

depicted in the photographs or otherwise catalogue any

characteristics of the photographs that he considers objectionable.

He instead lodges a blanket challenge to counsel's failure to object

to any of the photographs on the ground that the photographs were

necessarily or inherently prejudicial as photographs of the

deceased.   Petitioner contends that the photographs injected an

impermissible outside influence into the jury's determination of the

evidence.

        Although this issue was not addressed in the CCA's opinion on

direct appeal (LD 8), Petitioner raised it before the CSC in his

habeas petition (LD 12, printed p. 4), and the CSC summarily denied

the petition (LD 13).   The silent decision of the CSC constitutes an

adjudication on the merits.

        A.   <u>Background</u>

        Petitioner does not dispute or object to Respondent's summary

of the pertinent proceedings set forth in the answer as follows:

> In a motion in limine before the presentation of evidence,
> the prosecution said it intended to introduce postmortem
> photos of the victim, Neuman. (1 CT 219-220, 244-244-245.)
> When the parties discussed this issue, the court said it
> would admit the photos if there was nothing "unduly
> offensive" about them. (1 RT 75.) The prosecutor said she
> had removed any photos that seemed prejudicial, and that
> the photos that she intended to introduce were taken after
> Neuman's body was cleaned. (1 RT 75-76.) Defense counsel
> said he would examine the photos before deciding whether
> to object, and he would object to any photos that were
> "overboard." (1 RT 76.) The court said it was prepared to
> admit the photos even if they were "bloody" but was
> inclined to sustain objections if there were too many
> photos showing the same view. <u>Id</u>. Defense counsel said he

1
2
wanted to avoid any photos that had no relevance other than "sensational value." The prosecutor said she was not offering any photos like that. (1 RT 77.)

3
4
5
6
7
8
Later, during the prosecution's case-in-chief, the prosecutor introduced the testimony of the pathologist, Dr. Lawrence. (2 RT 379.) In his testimony, Dr. Lawrence reviewed and discussed eighteen autopsy photos, which were labeled as prosecution exhibits 9 through 26. The photos depicted Neuman's arm, hands, fingers, forehead, abdomen, head, and face. Some of them showed his gunshot wounds. (2 RT 389-99.) After Dr. Lawrence finished testifying, the court admitted the photos without objection. (2 RT 426.)

9
(Ans., doc. 28, 46.)

10
        B.   Analysis

11
12
13
    As previously set forth in connection with the confrontation

claim, the testimony of Dr. Lawrence revealed that the photographs

14
showed abrasions on the victim's arm, blood or lacerations on his

15
elbow, abrasions on his finger and forearm, scratches on the backs

16
17
of his finger and left hand, bruises and abrasions on his head and

face, tempered glass embedded in his forehead, gunshot wounds to his

18
19
abdomen and arm, a pattern of five similar-looking gunshot entrance

20
wounds with a similar direction in the upper body grouped in an area

21
twelve or fifteen inches in size, four exit wounds in the left side

22
of his body, one bullet recovered in the soft tissues of the left

23
flank, and lividity in his body.  (2 RT 389-403.)  The photographs

24
25
were thus relevant to factual issues concerning the course of the

26
homicide and the identity of the perpetrator.

27
    The photographs do not appear to have been sensational or

28
unnecessarily duplicative.  Although by their nature they were

unpleasant, there is no indication they were unduly inflammatory.

Further, the nature of the wounds and condition of the body of the

deceased were not matters extraneous to the jury's consideration of

the evidence, but rather were part and parcel of the physical and

forensic evidence that the jury had to consider and evaluate.

The record supports a conclusion that defense counsel reviewed

the photographs and determined not to object to their admission.  On

the record before the Court, counsel could rationally have

determined that an objection based on Cal. Evid. Code § 352 based on

undue prejudice would have been unsuccessful in light of state law

generally supporting the introduction of autopsy photographs.  See

People v. Howard, 51 Cal.4th 15, 33 (2010), cert. den. Howard v.

California, 132 S.Ct. 213 (2011) (upholding against a due process

challenge the discretionary admission of autopsy photographs of

gunshot wounds to the head that were not particularly gruesome or

inflammatory and noting that autopsy photographs "are routinely

admitted to establish the nature and placement of the victim's

wounds and to clarify the testimony of prosecution witnesses

regarding the crime scene and the autopsy, even if other evidence

may serve the same purposes"); People v. Loker, 44 Cal.4th 691, 704-

05 (2008) (upholding the admission of autopsy photographs in a first

degree murder case where the photographs were relevant to various

aspects of the prosecution's case, including theories of

premeditation and felony murder as well as the mode of the homicide,

the nature and placement of the fatal wounds, and illustration of the testimony of the coroner and percipient witnesses; the court noted that the prosecution was not obligated to "accept antiseptic stipulations in lieu of photographic evidence"). Here, because of the strong relevance of the evidence and the absence of specific indicia of excessively inflammatory content, the state court could reasonably have concluded that admitting the autopsy photographs was neither arbitrary nor prejudicial.

Further, there is no clearly established federal law prohibiting the admission of autopsy photographs or other prejudicial evidence. A state court's procedural or evidentiary ruling may be subject to federal habeas review if it violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by admitting evidence so arbitrary or prejudicial that is admission rendered the trial fundamentally unfair and violated fundamental conceptions of justice. Perry v. New Hampshire, - U.S.-, 132 S.Ct. 716, 723 (2012); Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).

The Supreme Court has not yet clearly ruled that the admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of a writ of habeas corpus. Estelle v. McGuire, 502 U.S. at 75 n.5 (declining to state an opinion on whether a state law would violate the Due Process Clause if it permitted use of prior crimes evidence to show propensity to commit a charged crime). Absent such clearly established federal law, it cannot be concluded that a state court's

evidentiary ruling was contrary to, or an unreasonable application of, Supreme Court precedent under 28 U.S.C. § 2254(d)()1). Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (citing Carey v. Musladin, 549 U.S. 70, 77 (2006)); Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008), cert. den., Larson v. Belleque, 555 U.S. 871 (2008) (denying a due process claim concerning the admission of prior crimes evidence); Alberni v. McDaniel, 458 F.3d 860, 866-67 (9th Cir. 2006), cert. den., - U.S. -, 127 S.Ct. 1834 (2007) (denying a due process claim concerning the admission of past violent actions as propensity evidence in a second degree murder case for want of a "clearly established" rule from the Supreme Court); Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008), cert. den., 555 U.S. 1117 (2009) (finding no unreasonable application of clearly established Supreme Court precedent regarding either propensity evidence or general due process principles where in a case of rape, kidnapping, and assault against the Petitioner's other family members, the state court admitted evidence that the defendant had committed uncharged sexual assaults of his daughter).

Here, Petitioner's counsel could have exercised a rational, professional, tactical judgment not to lodge a futile objection to the photographs. Further, in view of the strong evidence of Petitioner's guilt, it does not appear that Petitioner suffered prejudice from the admission of the photographs. It is, therefore, concluded that the state court decision denying Petitioner's ineffective assistance claim was not contrary to, or an unreasonable application of, clearly established federal law.

Accordingly, it will be recommended that Petitioner's due process claim relating to the admission of autopsy photographs be

denied.

XI.   Ineffective Assistance of Counsel for Failing to Object
      to the Prosecutor's Argument and Misconduct

Petitioner argues that his counsel was ineffective for failing
to object to what Petitioner characterizes as the prosecutor's
vouching for witnesses and making improper remarks regarding
Petitioner's guilt.

This claim was not addressed in the CCA's decision on direct
appeal (LD 8), but Petitioner raised it before the CSC in his habeas
petition (LD 12, supp., 25-32), and the CSC summarily denied the
petition (LD 13).  The silent decision of the CSC constitutes an
adjudication on the merits.

Because Petitioner's ineffective assistance claims depend in
part on the separate question of whether there was any objectionable
prosecutorial misconduct that required counsel to object, the Court
will review each of the specific allegations of misconduct before
addressing any related ineffective assistance of counsel.

A.   Prosecutorial Misconduct

It is clearly established federal law within the meaning of
§ 2254(d)(1) that a prosecutor's improper remarks violate the
Constitution only if they so infect the trial with unfairness as to
make the resulting conviction a denial of due process.  Parker v.
Matthews, – U.S. -, 132 S.Ct. 2148, 2153 (2012) (per curiam); see,
Darden v. Wainwright, 477 U.S. 168, 181 (1986); Comer v. Schriro,

480 F.3d 960, 988 (9th Cir. 2007).  Prosecutorial misconduct deprives the defendant of a fair trial as guaranteed by the Due Process Clause if it prejudicially affects the substantial rights of a defendant.  United States v. Yarbrough, 852 F.2d 1522, 1539 (9th Cir. 1988) (citing Smith v. Phillips, 455 U.S. 209, 219 (1982)).  However, the standard of review of claims concerning prosecutorial misconduct in a § 2254 proceeding is the narrow standard of due process, and not the broad exercise of supervisory power; improper argument does not, per se, violate a defendant's constitutional rights.  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (citing Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996)).  This Court must, therefore, determine whether the alleged misconduct rendered a trial fundamentally unfair.  Darden v. Wainwright, 477 U.S. at 183.  The Court must also determine whether the prosecutor's actions constituted misconduct, and whether the conduct violated Petitioner's right to due process of law.  Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000).

Further, to grant habeas relief, this Court must conclude that the state court's rejection of the prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Parker v. Matthews, 132 S.Ct. at 2155 (quoting Harrington v. Richter, 131 S.Ct. at 767-87).  In addition, the standard of Darden v. Wainwright is a very general one that

71

leaves courts with more leeway in reaching outcomes in case-by-case determinations.  Parker v. Matthews, 132 S.Ct. at 2155 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  In determining whether remarks in argument rendered a trial fundamentally unfair, a court must judge the remarks in the context of the entire proceeding to determine whether the argument influenced the jury's decision. Boyde v. California, 494 U.S. 370, 385 (1990); Darden v. Wainwright, 477 U.S. at 179-82.  In Darden, the Court considered whether the prosecutor manipulated or misstated evidence, whether specific rights of the accused were implicated, the context of the remarks in light of both parties' arguments, the instructions given by the trial court, and the weight of the evidence.  Darden, 477 U.S. at 179-82.

Prosecutors may argue reasonable inferences based on the evidence, including that witnesses for one of the two sides are lying.  United States v. Necoechea, 986 F.2d at 1276.  In contrast, vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony.  United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993).  Vouching for the credibility of a witness or expressing a personal opinion concerning the accused's guilt can pose two dangers.  First, it can convey the impression that evidence known by the prosecutor but not presented to the jury supports the

charges, and thus it can jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury. United States v. Young, 470 U.S. 1, 18 (1985).  Second, the prosecutor's opinion reflects the imprimatur of the government and may induce the jury to trust the government's judgment rather than its own assessment of the evidence.  Id. at 18-19.

When a prosecutor engages in argument that violates the ethical principle that a lawyer not express a personal belief or opinion in the truth or falsity of any testimony or evidence, the violation must be viewed in context to determine whether the prosecutor's conduct affected the fairness of the trial.  Id. at 10-11.  To determine whether prejudicial error occurred, a court must consider the probable effect of the prosecutor's argument on the jury's ability to judge the evidence fairly.  Id. at 12.  Vouching for a witness's credibility is more likely to be damaging where the credibility of the witness is crucial.  United States v. Edwards, 154 F.3d 915, 921 (9th Cir. 1998).  Further, the Court is mindful that the standard of Darden v. Wainwright is a very general one.

B.   Remark regarding Not Seeing the Victim

At the commencement of her argument, the prosecutor stated:

And a long time ago, two months ago, I introduced you
to a man named Ruben Sanchez Neuman.  We haven't seen him
since, have we?  Maybe in some pictures, maybe he's been
talked about a little bit.  We haven't seen him since.
And the reason we haven't seen him since is because he fell
victim to the man sitting at the edge of the table, Ceasar
Perez.  He was murdered.  And that is why we're here today.

73

(LD 3, ll RT 2577.)

Petitioner does not explain why this remark is allegedly improper.  Argument that Petitioner was the perpetrator of the murder was fair argument based on the evidence in the record.

Petitioner may be arguing that the remark was an appeal to sympathy.  It is improper to appeal to the jurors' emotions and fears or to inform the jury that it has any duty other than the weighing of the evidence.  United States v. Nobari, 574 F.3d 1065, 1077 (9th Cir. 2009).  However, the argument here was not overly dramatic or emotionally charged; it was a matter-of-fact comment on the state of the evidence pertaining to Petitioner's behavior.

Accordingly, the state court could reasonably have concluded that the argument was not improper or did not result in any fundamental unfairness.

C.   Argument concerning Lack of Provocation and
Characterization of Petitioner as a Thug

Petitioner quotes from several pages of the prosecutor's argument but does not specify either the particular portion or portions that are challenged as improper or the legal basis for the claim of misconduct.

In the course of arguing that Petitioner was guilty of murder with malice aforethought and not manslaughter, the prosecutor contended that Petitioner could not have killed in the sudden heat of passion because there was no legally adequate provocation or rash

action; to the contrary, Petitioner intended his act, as
demonstrated by his choices to draw his firearm and shoot
repeatedly.  (Id. at 2582-86.)  The prosecutor stated she wanted to
review the evidence of intent to kill.  (Id. at 2586.)  She stated,
"This was an unprovoked act."  She then recounted the evidence of a
course of intentional and unprovoked conduct, including Petitioner's
starting an argument earlier in the evening, telling Meza to stop
the truck, starting the fight with the victim and throwing the first
punch, encouraging others to participate, firing the whole clip into
the victim, telling Meza and Francisco in the truck after shooting
the victim "seven times for nothing" that "There's one less of
them," showing no remorse or concern for the victim after the event,
and fleeing the country.  (Id. at 2587-88.)  The prosecutor reviewed
the elements of murder; emphasized that to an ordinary, reasonable
person, the victim's having worn red pants was not adequate
provocation for homicide; invited the jury to conclude that
petitioner's conduct and flight evinced intent to kill and
consciousness of guilt; and noted that the murder benefited the gang
by instilling fear in people.  The prosecutor concluded, "Murders
intimidate people.  They make them fear the type of people that
commit them.  And by doing that, thugs like Cesar Perez earn
respect."  (Id. at 2588.)

     The prosecutor's argument generally constituted fair comment on
the evidence.  The prosecutor's characterization of Petitioner as a

"thug" was denigrating and reflected a judgment of Petitioner's conduct and character.  However, the Court notes that the defense likewise acknowledged the accuracy of the prosecutor's characterization of the witnesses against Petitioner and referred to them as lying gangbangers and street thugs.  (Id. at 2633.) Further, the prosecutor's statement was made in the course of argument concerning whether the crime was gang-motivated and benefited a criminal street gang; Petitioner's concerted, violent behavior and associations with gang members related to core issues in the case.  The assessment followed the prosecutor's review of the considerable evidence of gang intimidation and violence.  The prosecutor then stated, "Out there, you earn respect by intimidation and fear and violence."  (Id. at 2589.)  Although somewhat harsh, the characterization was warranted by the evidence recounted by the prosecutor and does not constitute an improper attack on Petitioner.

      In any event, in light of the entire record, including considerable evidence of gang violence, it does not appear that the remarks would have influenced the jury's verdict or resulted in any fundamental unfairness.

      The Court concludes that the state court could have reasonably concluded that this portion of the argument did not violate Petitioner's right to due process of law.

      D.   Argument regarding Witness Vicki Bozarth

      Petitioner next quotes a portion of the prosecutor's argument

concerning one of the many witnesses who provided corroborating

testimony concerning the arrival of Petitioner and his companions at

the intersection, the assault and shooting, and the departure of the

perpetrators.  In the course of a review of the testimony of a

jogger and neighbors who lived at or near the intersection, the

prosecutor referred to Vicki Bozarth, who lived in a house on the

corner where the incident happened.  (Id. at 2597-2603.)  The

prosecutor summarized Bozarth's testimony that upon hearing a loud

crash and gunshots, she looked out and saw a wrecked bike and the

departing pickup truck with a male running after it and then jumping

into it.  The prosecutor argued that Marlena Phipps' testimony

corroborated not only Bozarth's testimony regarding the running man

and the truck, but also the testimony of Pena, Meza, and Felix that

Petitioner ran to the truck after he shot the victim, and Arellano's

testimony that only Gomez and Petitioner were standing next to the

muzzle flashes and were the last two people at the scene.  (Id. at

2603.)  The prosecutor argued that the co-participants in the

assault, as members or loyal associates of a criminal street gang,

felt pressure to participate in the gang attack to avoid either

being seen as weak or being beaten themselves for not participating,

but they immediately ran when the shooting began.  She argued that

it was logical that the shooter was the last person to get into the

vehicle and that all the independent eyewitness testimony

corroborated or was consistent with Petitioner's being the shooter

77

who ran to the truck as it was departing.  She argued that the man

Bozarth saw running to the truck after she heard gunshots was

Petitioner.  She noted that the independent eyewitness testimony of

the persons in the vicinity corroborated the co-participants'

identification of Petitioner as the shooter.  She emphasized that

the identification was actually made by the co-participants in the

crime.  She remarked, "You don't get to pick them ladies and

gentlemen.  These cases come to you as they are.  It is what it is."

(Id. at 2603-05.)  She reminded the jurors expressly of their duty

to listen to the accomplices who had entered into plea agreements

and to weigh their evidence against what others told them, to see if

it was corroborated and made sense, and then come to a conclusion.

(Id. at 2605.)  She stated that the four accomplices' testimony had

to be corroborated by evidence provided by someone else that

connects the defendant to the crime, and pointed out that Ochoa and

Vizcarra were not accomplices.  (Id. at 2606.)

     Petitioner has not suggested how this argument was improper.

The prosecutor reviewed the key facts of the body of the crime from

the point of view of multiple witnesses, and she argued fair

inferences from the evidence.  The references to corroboration

fairly discriminated between the evidence from the accomplices on

the one hand, and that from the independent witnesses on the other.

The prosecutor did not argue that one accomplice corroborated the

others, but rather carefully summarized the independent testimonial

and physical evidence and reviewed how it was internally consistent and further corroborated the statements and testimony of the accomplices.  (Id. at 2605-17.)  She did not express inappropriate opinions regarding the evidence, but rather summarized it and argued the significance of the evidence.

The Court concludes that a state court could reasonably have concluded there was no misconduct or no fundamental unfairness resulting from this portion of the argument.

E.   Argument regarding Flight as Evincing Consciousness of Guilt

Petitioner challenges the prosecutor's argument on Petitioner's flight.

The prosecutor recounted Petitioner's visit to his probation officer two days before his scheduled reporting time and several days after the shooting.  She explained Petitioner's apparently false story of going to Arizona as necessary to avoid issuance of a warrant for his arrest by probation authorities for a failure to report; a warrant would impede passage over the border to Mexico. She noted that flight immediately after the commission of a crime is not sufficient to establish guilt but could be considered, and argued that Petitioner fled to Mexico which evinced his consciousness of guilt of the shooting.  (Id. at 2621-23.)  She summarized the evidence, argued that Petitioner committed the murder to move up in the gang, and reminded the jury that the killing was first degree murder because Petitioner stood over the victim, who

79

had already been beaten down on the ground, and fired seven shots, causing the victim to scream in pain.  (Id. at 2624.)

The prosecutor did not offer any improper personal opinions or otherwise vouch for the witnesses, but instead commented on the state of the evidence in the record.  To the extent that she referred to Petitioner's firing seven shots into the vulnerable victim and causing the victim to scream, the prosecutor's argument was supported by the evidence.

The state court could reasonably have determined that the account of Petitioner's conduct was permissible comment on the evidence and not an impermissible appeal to passion or sympathy because the comment did no more than summarize the facts of the brutal offense.  The state court could reasonably have concluded there was no fundamentally unfair conduct.

F.  Argument regarding Witness Daniel Britt

Petitioner next objects to the prosecutor's rebuttal argument concerning witness Daniel Britt, who testified that while in custody, Sergio Felix told Britt that Arellano was the killer.

In argument, the defense reviewed the testimony of the accomplices and the eyewitnesses and recounted the timeline of the emergence of the accomplices' statements.  Defense counsel argued that the accomplices had strong personal interests to lie, and Vizcarra's strong feelings for Pena rendered her an unreliable witness.  The defense argued that Arellano was the killer because unlike Petitioner, who was corpulent, Arellano was thin and admitted that he wore a black shirt; the jogger, Ms. Lominario, testified that the shooter got into a Jeep; and Britt testified to Felix's

extra-judicial statement that it was Arellano who killed Neuman. (LD 3, 11 RT 2625-66.)

     In response, the prosecutor argued that the defense's story of Petitioner being framed by gang members was untenable because Petitioner alone fled the country, demonstrating consciousness of guilt; Luis Meza, who was not arrested with everyone else, could not have made up the details he knew; and Daniel Britt was not a credible person.  She argued that Lominario was not certain that the shooter got back into the Jeep, and that Lominario's testimony was otherwise consistent with that of the other witnesses.  The prosecutor stated, "Daniel Britt is the only person who testified before you that the shooter was someone other than Cesar Perez, and Daniel Britt wasn't there."  (Id. at 2671, 2667-71.)  She contrasted his testimony with that of Pena, Meza, Felix, and Arellano, who were present and were percipient witnesses.  (Id. at 2671-72.) The prosecutor argued fair inferences from the record; the question of which witnesses to credit was within the jury's province.

     Petitioner has not even suggested, let alone shown, how these remarks could have resulted in unfairness in the proceedings.  The Court, therefore, concludes that the state court could have reasonably determined no misconduct occurred or no fundamental unfairness resulted from the argument.

              G.   The Prosecutor's Summation in Rebuttal

     Again, without explanation of the precise basis on which Petitioner rests his claim of misconduct, Petitioner quotes a long portion of the very last part of the prosecutor's rebuttal argument.

     The prosecutor continued with her rebuttal, emphasizing that the testimony of Vicki Bozarth and Aolani Smith, who both came out

after the shots were fired and saw only one vehicle (the truck), was consistent with Pena's testimony that the Jeep left the scene earlier than the truck.  She noted the accomplices' testimony that Petitioner was the shooter was corroborated by Marlena Phipps, who was certain that the man who started the fight came from the pickup truck, and by physical evidence, such as the beer cans near where the Jeep was; further, Vizcarra was credible and was not biased by love for Pena because she had moved on with her life and had a baby with someone else.  (Id. at 2672-73.)  The prosecutor reviewed Meza's testimony in detail and reviewed evidence of gang activity. She then embarked on a final summation of the evidence of the criminal transaction, beginning with the victim's peaceful act of walking with his bicycle three blocks from home, continuing with a detailed recounting of the gang's aggression led by Petitioner to the point at which the victim was on the ground and the others stomped on him and Petitioner "unloaded five rounds into Joey's back."  (Id. at 2685, 2674-85.)  The prosecutor referred to the victim's screaming in pain and his dying at the scene; she argued that the shooter's pursuit of the truck was corroborated by Vicki Bozarth, Meza, and Gomez.  (Id. at 2685-86.)  The prosecutor concluded:

> And you know how you know that he meant to do this
> and that he wanted to do this and that he's not sorry
> one bit that this happened?  Because what he says next,
> well, there is now one less of them.  And he's right.
> There is one less Norteno gang member in the world, but
> he had a name.  His name was Joey.  He had a family and
> a life and he didn't deserve to die like that.
>
> One thing that I agree with [defense counsel] about is
> this is your community and I trust you're going to do the
> right thing.

His name was Joey and he died on July 10th of 2004.
You decide.

(Id. at 2586.)

With respect to the vivid recounting of the homicide, the prosecutor's argument was not unduly inflammatory.  The victim's suffering was not improperly emphasized.  Emphasis on the victim's individuality and behavior related to core issues of lack of adequate provocation and the presence of the requisite gang motivation.

The prosecutor implied urging of the jury to do "the right thing" was made in the context of highlighting the viciousness of the gang violence that she had just described in detail.  The prosecutor's appeal was made in the course of her final review of the evidence, and not in a manner reasonably understood as referring to extra-record matters or as inviting the jury to perform any duty other than the weighing of the evidence.

In summary, a state court could reasonably have concluded that it was not reasonably likely that a rational juror would misunderstand this argument as an inappropriate appeal to passion, prejudice, or other extra-record matters.  Thus, the Court concludes that this portion of the argument has not been shown to constitute prejudicial misconduct or to have resulted in any unfairness.

///

///

H.   Additional Conference concerning Argument

Finally, Petitioner quotes a portion of the transcript of a post-argument conference, held outside the presence of the jury, regarding the objections made during the argument.

Petitioner's counsel stated that he objected to the prosecutor's comment that the plea of Mr. Meza "was not to any gang enhancement," which was vouching for the witness to the effect that he was not in fact a gang member where the evidence was disputed. (Id. at 2690.)  The prosecutor had reviewed the gang activity and status of the accomplices, acknowledged that Meza was a "banger too," but noted that he was different because he had simply grown up in the neighborhood but was not "hardcore...."  (Id. at 2612.)  She argued that he was different: he had a job and worked during the whole period, and he had no gang tattoos, prior arrests, or prior contact with law enforcement.  He pled guilty to kicking the victim and thereby committing assault with force likely to cause great bodily injury, receiving a year in jail. The prosecutor stated, "Now, if you'll notice, he did not plead to the gang enhancement." (Id. at 2613.)  The trial court stated that it had overruled the objection to this argument because the court did not consider it to have been harkening the jury to consider that Meza "didn't have to plead to anything that was gang."  (Id.)

The prosecutor's reference was to the terms of the plea bargain, a subject central to the credibility of the pleading

accomplices.  The prosecutor did not imply that there was extra-record evidence that was determinative or even considered in the plea bargaining process.  Likewise, she did not express her personal opinion with respect to any part of the plea bargaining process or the credibility of the witness.  Instead, she referred to the terms of the plea bargain.  The substance and form of her argument did not constitute impermissible vouching for a witness, but rather permissible marshaling of the facts.  The state court could reasonably have concluded that no misconduct had occurred, or that it was not likely that a jury would have understood her comments as vouching.

The next matter raised in the post-argument conference was the defense's concern with comparison of the demeanor of the Petitioner with that of Meza.  Defense counsel argued that it improperly sought the jury's consideration of Petitioner's demeanor during the trial, which was a matter that was not evidence.

The prosecutor had read or summarized in detail Meza's testimony about Petitioner's post-shooting statement that "there's one less of them" and then had asked Meza about Petitioner's demeanor earlier in the evening.  (Id. at 2681.)  The trial court overruled the objection on the ground that the comparison had been between Petitioner's demeanor first before, and then at the time of, the attack on the victim.  (Id. at 2690-92.)

85

No comparison with Petitioner's in-court behavior is brought to this Court's attention.  The trial court could reasonably have concluded that no rational juror would have understood the argument as an inappropriate comparison with matters outside the body of the evidence before the jury.  In any event, the jury was properly instructed that the lawyers' comments and argument were not evidence (11 RT 2534), and thus to the extent that any isolated instanced of misconduct occurred, any harmful effect was cured.  Sassounian v. Roe, 230 F.3d 1097, 1107 (9th Cir. 2000).  Arguments of counsel carry less weight with a jury than do instructions from the court.  Boyde v. California, 494 U.S. at 384-85.

In sum, the evidence against the Petitioner was strong and was from multiple sources.  The state court could reasonably have concluded that any remark concerning the defendant's demeanor was not understood in a way that violated the Constitution and did not render the proceedings fundamentally unfair.

I.   Ineffective Assistance of Counsel

As the foregoing analysis of Petitioner's contentions concerning alleged prosecutorial misconduct in argument reflects, the state court could reasonably have concluded that the prosecutor did not engage in prejudicial misconduct in argument that rendered Petitioner's trial fundamentally unfair.  Thus, a fairminded jurist could conclude that Petitioner's counsel exercised a reasonable tactical judgment not to object further to the prosecutor's

arguments and thus did not engage in conduct below professional standards of competence.

Accordingly, it will be recommended that Petitioner's claim or claims of ineffective assistance of counsel for failing to object to misconduct in argument should be denied.

### XII.   Insufficient Evidence of Firearm Enhancements

Petitioner alleges he suffered a violation of his right to due process of law because the evidence was insufficient to support the findings that he 1) discharged a firearm and caused death within the meaning of Cal. Pen. Code § 12022.53(d), and 2) was armed with a firearm during the commission of the offense within the meaning of Cal. Pen. Code § 12022(a).

This claim was not addressed by the CCA, but Petitioner raised it before the CSC in his petition for writ of habeas corpus.  (LD 12, ground 4.)  It has not been shown that the CSC's silent denial was not an adjudication on the merits.

To determine whether a conviction violates the constitutional guarantees of due process of law because of insufficient evidence, a federal court ruling on a petition for writ of habeas corpus must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 20-21 (1979); Windham v. Merkle, 163 F.3d 1092, 1101 (9th Cir. 1998); Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

All evidence must be considered in the light that is the most favorable to the prosecution.  Jackson, 443 U.S. at 319; Jones, 114 F.3d at 1008.  It is the trier of fact's responsibility to resolve conflicting testimony, weigh evidence, and draw reasonable inferences from the facts; thus, it must be assumed that the trier resolved all conflicts in a manner that supports the verdict. Jackson v. Virginia, 443 U.S. at 319; Jones, 114 F.3d at 1008.  The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but rather whether the jury could reasonably arrive at its verdict.  United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991).  Circumstantial evidence and the inferences reasonably drawn therefrom can be sufficient to prove any fact and to sustain a conviction, although mere suspicion or speculation does not rise to the level of sufficient evidence. United States v. Lennick, 18 F.3d 814, 820 (9th Cir. 1994); United States v. Stauffer, 922 F.2d 508, 514 (9th Cir. 1990); see, Jones v. Wood, 207 F.3d at 563.  The court must base its determination of the sufficiency of the evidence on a review of the record.  Jackson at 324.

The Jackson standard must be applied with reference to the substantive elements of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Windham, 163 F.3d at 1101. However, the minimum amount of evidence that the Due Process Clause requires to prove an offense is purely a matter of federal law.

88

Coleman v. Johnson, - U.S. -, 132 S.Ct. 2060, 2064 (2012) (per curiam).  For example, under Jackson, juries have broad discretion to decide what inferences to draw and are required only to draw reasonable inferences from basic facts to ultimate facts.  Id.

Further, under the AEDPA, federal courts must apply the standards of Jackson with an additional layer of deference.  Coleman v. Johnson, 132 S.Ct.at 2062; Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  This Court thus asks whether the state court decision being reviewed reflected an objectively unreasonable application of the Jackson standards to the facts of the case. Coleman v. Johnson, 132 S.Ct. at 2062; Juan H. v. Allen, 408 F.3d at 1275.  The determination of the state court of last review on a question of the sufficiency of the evidence is entitled to considerable deference under 28 U.S.C. § 2254(d).  Coleman v. Johnson, 132 S.Ct. at 2065.

Petitioner argues that the evidence is insufficient because Pena initially reported that Arellano was the shooter, Arellano admitted having worn black clothing, and Daniel Britt testified that he was told that Arellano was the shooter.  Petitioner further contends that the remaining evidence that supports a conclusion that Petitioner was the shooter was unreliable.

The trier of fact was presented with conflicting evidence concerning the identity of the shooter.  It was within the jury's province to consider the testimony and evidence, including the

circumstances that bore on the credibility of the witnesses, and to resolve any conflicts in the evidence.  The judgment is supported by evidence from the accomplices as well as from disinterested, independent witnesses and physical evidence; the record does not reflect that the evidence against Petitioner was inherently unreliable.  In its review of the petition, this Court must conclude that the trier of fact resolved all conflicts in favor of the judgment.  A rational trier of fact could have found beyond a reasonable doubt that Petitioner was armed with a firearm during the commission of the offense, discharged a firearm, and thereby caused the death of the victim.

Therefore, the state court decision rejecting Petitioner's challenge to the sufficiency of the evidence was an objectively reasonable application of the <u>Jackson</u> standard.  The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law within the meaning of § 2254(d)(1).  Accordingly, it will be recommended that Petitioner's claim or claims concerning the sufficiency of the evidence to support the firearms findings be denied.

In sum, it will be recommended that insofar as Petitioner raises state law claims, the petition be dismissed; the remainder of the petition be denied; and judgment be entered for Respondent.

///

///

XIII.   <u>Motion for Expansion of the Record and for an Evidentiary Hearing</u>

On December 12, 2012, Petitioner filed a motion to expand the record to include declarations from Alvarado Arellano and Petitioner, and for an evidentiary hearing on all the claims raised in this proceeding and on the major issues of disputed fact pertinent to Petitioner's guilt that have already been determined by the jury.  Respondent filed opposition to the motion on December 31, 2012.  Petitioner did not file a reply.

In his declaration, Petitioner denies he shot or killed the victim, that he participated in a criminal street gang, or that he ever made statements indicating that he had done so.  Further, Petitioner declares he knows the accomplices made up false evidence against him to obtain plea bargains.  (Doc. 37, 8-9.)  In his declaration, Arellano, who identifies himself as an inmate of the Kern Valley State Prison, states Petitioner did not shoot the victim and that someone else, who is not identified, did.  (<u>Id.</u> at 10.)

The decision to grant an evidentiary hearing is generally a matter left to the sound discretion of the district courts.  28 U.S.C. § 2254; Habeas Rule 8(a); <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007).  To obtain an evidentiary hearing in federal court under the AEDPA, a petitioner must allege a colorable claim by alleging disputed facts which, if proved, would entitle him to relief.  <u>Schriro v. Landrigan</u>, 550 U.S. at 474.

The determination of entitlement to relief is, in turn, is limited by 28 U.S.C. § 2254(d)(1), which requires that to obtain relief with respect to a claim adjudicated on the merits in state court, the adjudication must result in a decision that was either contrary to, or an unreasonable application of, clearly established federal law. Schriro v. Landrigan, 550 U.S. at 474. Further, in analyzing a claim pursuant to § 2254(d)(1), a federal court is limited to the record that was before the state court that adjudicated the claim on the merits. Cullen v. Pinholster, 131 S.Ct. at 1398.

Thus, when a state court record precludes habeas relief under the limitations set forth in § 2254(d), a district court is not required to hold an evidentiary hearing. Cullen v. Pinholster, 131 S.Ct. at 1399 (citing Schriro v. Landrigan, 550 U.S. at 474). An evidentiary hearing may be granted with respect to a claim adjudicated on the merits in state court where the petitioner satisfies § 2254(d)(1), or where § 2254(d)(1) does not apply, such as where the claim was not adjudicated on the merits in state court. Cullen v. Pinholster, 131 S.Ct. at 1398, 1400-01.

Here, Petitioner has not shown that the state court decisions on his claims were contrary to or unreasonably applied clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1). Likewise, he has not demonstrated that the state court decisions were based on any unreasonable determination of the

facts in light of the evidence presented in the state court proceedings within the meaning of 28 U.S.C. § 2254(d)(2).   Further, reference to the petition for writ of habeas corpus filed in the California Supreme Court (LD 12) shows that the declarations of Petitioner and Arellano were not presented to the CSC for review.

Accordingly, it will be recommended that this Court deny the motion to expand the record and grant an evidentiary hearing.

XIV.   Certificate of Appealability

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the Court of Appeals from the final order in a habeas proceeding in which the detention complained of arises out of process issued by a state court.   28 U.S.C. § 2253(c)(1)(A); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).   A district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Rule 11(a) of the Rules Governing Section 2254 Cases.

A certificate of appealability may issue only if the applicant makes a substantial showing of the denial of a constitutional right. § 2253(c)(2).   Under this standard, a petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.   Miller-El v. Cockrell, 537 U.S. at 336 (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).   A certificate should issue if the Petitioner shows that jurists of reason would find it debatable whether: (1) the petition states a valid claim of the denial of a constitutional

right, and (2) the district court was correct in any procedural ruling. <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000).

In determining this issue, a court conducts an overview of the claims in the habeas petition, generally assesses their merits, and determines whether the resolution was debatable among jurists of reason or wrong. <u>Id.</u> An applicant must show more than an absence of frivolity or the existence of mere good faith; however, the applicant need not show that the appeal will succeed. <u>Miller-El v. Cockrell</u>, 537 U.S. at 338.

Here, it does not appear that reasonable jurists could debate whether the petition should have been resolved in a different manner. Petitioner has not made a substantial showing of the denial of a constitutional right.

Accordingly, it will be recommended that the Court decline to issue a certificate of appealability.

XV.  <u>Recommendations</u>

In accordance with the foregoing analysis, it is RECOMMENDED that:

1)  Insofar as Petitioner raises claims based on state law, the second amended petition for writ of habeas corpus be DISMISSED; and

2)  The remainder of the second amended petition for writ of habeas corpus be DENIED; and

3)  The motion for expansion of the record and for an evidentiary hearing be DENIED; and

4)  Judgment be ENTERED for Respondent; and

5)  The Court DECLINE to issue a certificate of appealability.

1    These findings and recommendations are submitted to the United

2  States District Court Judge assigned to the case, pursuant to the

3  provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

4  Rules of Practice for the United States District Court, Eastern

5  District of California.  Within thirty (30) days after being served

6  with a copy, any party may file written objections with the Court

7  and serve a copy on all parties.  Such a document should be

8  captioned "Objections to Magistrate Judge's Findings and

9  Recommendations."  Replies to the objections shall be served and

10 filed within fourteen (14) days (plus three (3) days if served by

11 mail) after service of the objections.  The Court will then review

12 the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).

13 The parties are advised that failure to file objections within the

14 specified time may waive the right to appeal the District Court's

15 order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

16

17

18 IT IS SO ORDERED.

19   Dated:   **May 22, 2014**           **/s/ Sheila K. Oberto**

20                                UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28

95